Wilfredo MENDOZA PEREZ,
Petitioner,

v.

U.S. IMMIGRATION AND NATURALI-
ZATION SERVICE, Respondent.

No. 89–70035.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 1990.

Decided May 7, 1990.

Carolyn P. Blum, Asylum Appeals Clinic, Boalt Hall School of Law, Berkeley, Cal., Sergio Garcia–Rodriguez Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for petitioner.

Alice M. Smith and Mark Walters, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Before SNEED, FARRIS and FERNANDEZ, Circuit Judges.

FARRIS, Circuit Judge:

Mr. Mendoza appeals the denial of his request for withholding of deportation and his application for political asylum. At issue is whether there was substantial evidence on which the Board of Immigration Appeals could affirm the Immigration Judge's finding that Mendoza did not establish either a "clear probability of persecution" or a "well-founded fear" of persecution.

## FACTS

Mendoza, an El Salvadoran, entered the United States without inspection on March 11, 1982, across the Mexican–American border. He was apprehended by the INS and deportation proceedings were started. On March 11, 1985, Mendoza conceded deportability to the Immigration Judge and moved to remand for further consideration of his asylum application. This motion was denied and Mendoza appealed to the Board of Immigration Appeals, which denied the appeal and ordered voluntary deportation on October 25, 1988.

Mendoza bases his request for withholding of deportation and asylum on the fact that he was threatened with serious harm shortly before he left El Salvador. Mendoza was an accountant with the Salvadoran Communal Union for between three and five years, before he left the country. He described the Communal Union as a group that works with the American Institute for Free Labor Development to assist the formation of agricultural cooperatives among the peasants. Mendoza helped landless farmers form and manage the financial aspects of cooperatives throughout the countryside. He testified that this activity was questioned by the government, which viewed such work as encouragement to the peasants to join the guerrillas.

On February 7, 1982, Mendoza received a letter addressed to him at his home. The letter threatened that if Mendoza did not leave the country within forty-eight hours, he would suffer the consequences. Mendoza testified to knowing of others with the Institute who had received similar threats and had been killed, both before and after he fled. Mendoza's father-in-law inquired of a friend in the local police department about the seriousness of the threat: The advice was to take the threat seriously and to leave the country. Mendoza's employer had the same advice. There was testimony that after he fled men asked for him at his home, although no other members of his family reported being harassed or threatened in any way.

The Immigration Judge and BIA made no explicit finding on Mendoza's credibility, therefore, for purposes of this review, we presume all of Mendoza's statements to be credible. *See Artiga Turcios v. INS*, 829 F.2d 720, 723 (9th Cir.1987).

## DISCUSSION

*I. Withholding of Deportation: 8 U.S.C. § 1253(h)*

Title 8 U.S.C. section 1253(h)(1) provides that

> The Attorney General shall not deport or return any alien … to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of [1] race, [2] religion, [3] nationality, [4] membership in a particular social group, or [5] political opinion.

To qualify under this section the alien must establish "clear probability" of persecution, for one of the five reasons listed, by the government or a group the government cannot control, if the alien were to be returned to his country. *See e.g., Artiga Turcios v. INS*, 829 F.2d 720, 723 (9th Cir.1987). The specific evidence provided by Mendoza, if believed, is sufficient to establish the probability that persecution of him as an individual is "more likely than not." *See INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984); *Artiga Turcios, supra; Estrada v. INS*, 775 F.2d 1018, 1021 (9th Cir.1985) (persecution must be directed at alien as an individual). Evidence of general violence in the alien's home country is insufficient, although it may help support the alien's specific claims. *See Artiga Turcios*, 829 F.2d at 723; *Zavala–Bonilla v. INS*, 730 F.2d

562, 564 (9th Cir.1984). We have allowed "[a]n alien's own testimony regarding the threats [to] establish[ ] a clear probability of persecution, if credible and supported by general documentary evidence that the threats should be considered seriously." *Artiga Turcios*, 829 F.2d at 723; *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1984).

Mendoza was directly, specifically, and immediately threatened by a group arguably tied to the government, yet not controlled by the government—a death squad. Mendoza's threat was targeted at him individually. He failed to produce the actual letter that he allegedly received, but the fact of its receipt and content has not been contested. His wife also testified as to its existence and gave reasons for its destruction. There is testimony that others who worked for his organization were killed, which suggests that the persecutors were willing to act against individuals connected with such groups.

While there are stronger cases than Mendoza's, involving actual beatings, assaults, and arrests of a petitioner or his family members, *see, e.g., Desir v. Ilchert*, 840 F.2d 723 (9th Cir.1988); *Argueta v. INS*, 759 F.2d 1395 (9th Cir.1985), Mendoza's fear has a stronger evidentiary base than petitioners in other cases where we have reversed BIA's denials for withholding deportation. For instance, in *Artiga Turcios v. INS*, 829 F.2d 720 (9th Cir.1987), the court concluded that "Artiga has introduced specific evidence that his life has been threatened because he is politically opposed to the anti-government guerrillas. Because he has been singled out and sought by men he reasonably believes to be guerrillas, the BIA's conclusion that the petitioner failed to show he has been targeted for persecution is unreasonable." 829 F.2d at 724. That he had been singled out was based on the following facts: He was former military and supposedly sought after by four unidentified men who were pointed out to him at a distance. He was sure they were guerrillas because (1) they knew his military nickname, (2) if from the military, they would have known his exact address and presumably would not have needed to "ask around" for him, (3) he did not recognize them, (4) he saw bulges in their clothing which he believed to be a new type of machine gun carried by the guerrillas, (5) he had read about former servicemen being targeted and killed by guerrillas. Artiga never had any contact with the men.

Accepting, as we do, that the threat to Mendoza was sufficiently specific and real and that persecution was "more likely than not," Mendoza must also show that the persecution was a result of one of the five characteristics set forth in section 1253(h). In prior cases, we have considered the conduct of the victim, as well as the position and perspective of the alleged persecutor.

Section [1253(h) ] could be read as providing that only the alien's race, religion, nationality, membership in a particular social group, or political opinion, not the persecutor's, can be considered in determining whether oppressive conduct constitutes persecution. However, we do not believe the section may properly be given so restrictive or mechanical a construction. "Persecution" occurs only when there is a difference between the persecutor's view and that of the victim; it is oppression which is inflicted on groups or individuals because of a difference that the persecutor will not tolerate. *See Sagermark* [*v. INS* ], 767 F.2d [645] at 649 [ (9th Cir.1985) ]; *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969). For this reason, in determining whether threats or violence constitute political persecution, it is permissible to examine the motivation of the persecutor; we may look to the political views and actions of the entity or individual responsible for the threats or violence, as well as to the victim's, and we may examine the relationship between the two.

*Hernandez–Ortiz v. INS*, 777 F.2d 509 (9th Cir.1985). *See also, Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir.1988).

Given Mendoza's involvement with a land reform organization and the apparent right-wing death squad, Mendoza's testimony that his feared persecution is politically motivated finds support in the record. *Cf.*

*Hernandez–Ortiz v. INS,* 777 F.2d 509 (9th Cir.1985); *Desir v. Ilchert,* 840 F.2d 723 (9th Cir.1988); *Artiga Turcios,* 829 F.2d at 721.

We concluded in *Artiga Turcios,* that there was "no reasonable explanation on the record for any of [the four men's] actions other than that the men sought forcibly to recruit Artiga to the guerrilla cause." 829 F.2d at 724. Similarly, there is no reasonable basis for the threat to Mendoza except his ties to the Communal Union and its work with the peasants and land reform. See also *Canjura–Flores v. INS,* 784 F.2d 885 (9th Cir.1985), a second case where we reversed a BIA denial of withholding deportation.

The cases relied upon by the INS are distinguishable. For example, in *Sarvia–Quintanilla v. INS,* 767 F.2d 1387 (9th Cir.1985), the BIA's denial of withholding deportation and asylum was affirmed. There were no specific threats. What was alleged as threats came from former associates in a leftist group the petitioner had dropped out of because of disagreement with its violent tactics. Affidavits relied upon by the alien failed to corroborate his testimony that specific threats had been made, nor suggest that his associates were looking for him or posed him a threat. Further, Sarvia's credibility was very much in doubt because of an admitted history of dishonesty.

*Estrada v. INS,* 775 F.2d 1018 (9th Cir. 1985), is another case where we affirmed the BIA's denial of withholding of deportation and asylum. Estrada was a member of a right wing party, for which he distributed leaflets. He also worked as a farm-hand and a messenger for the party's leader, Ocampo. Estrada played soccer with a police team and learned of illegalities by the police, which he reported to Ocampo. Ocampo went public and Estrada was allegedly threatened, but he could not be at all specific as to the form, time, place, or source of the threats. Estrada left the country after he got an exit permit from the government. He never openly expressed a political opinion against the Guatemalan government because they might

kill him. Ocampo was killed five years later and Estrada, because of his ties to Ocampo, feared for his life if he was returned to Guatemala. Supposedly, officials looked for him at his mother's house. Estrada was never arrested, detained, or interrogated by any government officials. The BIA and Immigration Judge held that testimony regarding the threats was not credible. In affirming the BIA, we gave proper deference to the finding on credibility, noting that it was supported by the evidence. This is an important distinction from Mendoza, who is deemed credible.

When an alien's testimony is credible, the BIA must point to substantial evidence in the record, that there is not a "clear probability" that the alien will be subject to persecution if the BIA denies withholding of deportation. *See e.g., Sarvia–Quintanilla v. United States INS,* 767 F.2d 1387, 1392–94 (9th Cir.1985) (threat speculative and lacking in detail); *Quintanilla–Ticas v. INS,* 783 F.2d 955, 957 (9th Cir.1986) (same). It failed to do so.

## II. Political Asylum: 8 U.S.C. §§ 1101(a)(42)(A), 1158(a)

█ To qualify for political asylum the alien must show that his fear is "genuine," *Hernandez–Ortiz v. INS,* 777 F.2d 509, 513 (9th Cir.1985), and, "by credible, direct, and specific evidence in the record," *Diaz–Escobar v. INS,* 782 F.2d 1488, 1492 (9th Cir. 1986), that persecution is a "reasonable possibility," *INS v. Cardoza–Fonseca,* 480 U.S. 421, 440, 107 S.Ct. 1207, 1217, 94 L.Ed.2d 434 (1987), quoting *INS v. Stevic,* 467 U.S. 407, 425, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984). Past persecution alone may satisfy the requirement. *See generally Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988).

█ The well-founded fear standard is easier to satisfy than the clear probability standard required for withholding deportation, *see Cardoza–Fonseca v. INS,* 480 U.S. 421, 449–50, 107 S.Ct. 1207, 1222–23, 94 L.Ed.2d 434 (1987), which Mendoza has satisfied. Thus Mendoza is eligible for asylum.

## CONCLUSION

Mendoza's testimony is presumed credible and evidenced a direct, specific, individual threat. There is insufficient evidence to deny Mendoza's requests. We reverse the BIA's denial of Mendoza's request for withholding of deportation and his request for political asylum. Since asylum is at the discretion of the Attorney General, that portion of the case is remanded for the exercise of that discretion.

REVERSED AND REMANDED IN PART.

SNEED, Circuit Judge, concurring specially:

I concur in the court's opinion with a reluctance grounded in dissatisfaction with both the law enacted by Congress and its application by this circuit.

As to the law, the standards "clear probability of persecution" and "well founded fear of persecution" have too little objective content to enable administrators and courts to apply them with confidence and consistency. It is impossible to exclude from the decisional process extra legal concerns derived from the experiences of the decision maker or his or her forbears. Also not excludable is the decision maker's understanding of the history of, and conditions prevailing in, the country of the refugee's origin. No doubt the argument that these influences should not be excluded can be made with some force. The difficulty the argument encounters, however, is that its strength suggests that administrators should be the decision makers rather than judges who in our legal system function best in applying law to facts established by an adversarial process in which their role is essentially a subordinate one.

The response of Congress has been to create immigration judges and the Bureau of Immigration Appeals that are mainly administrative but somewhat judicial in nature, and review by Article III judges, who are, it turns out, also mainly administrative and somewhat judicial. Obviously the reviewing judges should be much less administrative and more judicial, but that is very difficult to achieve in the context of "asylum" and "withholding of deportation" cases. The difficulty springs in part from the absence of a meaningful adversarial process in the system. The illegal alien tells his story to an immigration judge who frequently has heard the same or a similar story many times previously. There is no one to contradict it and quite often no one to corroborate it. Some "likelihood of falsity" meter flutters in the mind of the immigration judge and if the needle of that meter reaches a near vertical position the alien is in peril of being deported. The same process occurs at the Article III level. Both sets of "judges" are being used as administrators confronted with grossly inadequate information untested by an adversarial process and equipped with an authority that literally can mean life or death in some instances. Decisions frequently are made on the basis of untethered intuition.

Obviously Article III judges need not function precisely as do immigration judges. Occupying a higher rung in the review ladder their role could be reduced to spotting aberrational decisions by the immigration judges and reversing them as not being supported by substantial evidence. So long as consistency appeared to characterize the results affirmances would be proper.

It is very likely that Congress did intend the Article III judges generally to perform in this fashion. While some circuits appear substantially to so function, the Ninth Circuit does not. In four specific respects, the Ninth departs from this model. These are:

1. It has heightened the quantity or quality of substantial evidence that an INS decision which denies relief to the alien must surmount to avoid reversal.

2. It has imparted to the testimony of the alien in question an increasing degree of credibility to the point that only an explicit finding by an immigration judge of *incredibility* will justify a denial of withholding of deportation or asylum in any case in which the alien's story is not patently false.

3. It has eliminated any necessity that the alien's testimony be corroborated by relevant external evidence.

4. It treats "political neutrality" as an "opinion" for which an alien may show a "probability" or "likelihood" of persecution.

In each instance we stand apart from our sister circuits. Perhaps the beat of the drummer to which we march is the correct one; in any event, it is quite different.

### I. *The Substantial Evidence Standard.*

This circuit makes it easier than any other for an alien to argue successfully that a decision by an immigration judge is not supported by substantial evidence. The seed that yielded this fruit was *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1282 n. 8 (9th Cir.1984), in which this court began to review denials of withholding of deportation under a "heightened" substantial evidence standard. The reason offered for the departure was that where the issue is withholding deportation, a finding of a "probability" of persecution required granting the relief, whereas the granting of asylum was a matter within the discretion of the Attorney General. *Id.* and n. 9. Whatever may be the merits of this distinction, the "hydraulics" of the "withholding of deportation" and "asylum" provisions dictate that reducing the level of the first forces a lowering of the second.

Other circuits that have articulated explicitly the standard of review follow the abuse of discretion standard. The Fifth Circuit, for example, "accord[s] deference to the Board's interpretation of immigration statutes unless there are compelling indications that the Board's interpretation is wrong." *Campos–Guardado v. INS*, 809 F.2d 285, 289 (5th Cir.), *cert. denied*, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987) (citing *Guevara Flores v. INS*, 786 F.2d 1242, 1250 n. 8 (5th Cir.1986), *cert. denied*, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987)). The same is true for other circuits. *See Gumbol v. INS*, 815 F.2d 406, 411 (6th Cir.1987) (applying abuse of discretion standard); *Cruz–Lopez v. INS*, 802 F.2d 1518, 1523 (4th Cir.1986) (same); *McLeod v. INS*, 802 F.2d 89, 92 (3d Cir.1986) (same).

### II. *The "Incredibility" Requirement.*

Although the stricter standard of review employed in the Ninth Circuit may determine the outcome of some cases, the more troubling doctrinal development has been the creation of judicial fictions—all in the guise of statutory interpretation—that accord a steadily increasing presumption of verity to aliens' contentions with respect to each evidentiary "requirement." An illustration of this dynamic is the movement toward an "incredibility" requirement. An alien must provide specific evidence of persecution, and " 'mere assertions of possible fear' are insufficient." *Sarvia–Quintanilla v. INS*, 767 F.2d 1387, 1392 (9th Cir. 1985) (quoting *Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir.1983)). Lest this burden be too great, our circuit has determined that an alien's own testimony is controlling if "credible and supported by general documentary evidence that the threats should be considered serious." *Artiga–Turcios v. INS*, 829 F.2d 720, 723 (9th Cir.1987); *see Bolanos–Hernandez*, 767 F.2d at 1285.

Other circuits have been chary of according too much weight to an alien's own statements, for the obvious reason that they tend to be self-serving. *See, e.g., Gumbol*, 815 F.2d at 412 (defining the permissible parameters under which an alien's "own unsubstantiated testimony" will be accepted); *Carvajal–Munoz v. INS*, 743 F.2d 562, 577 (7th Cir.1984) (permitting alien's statements only under certain circumstances).

By grafting on the statute a doctrinal rule that the INS must make a formal credibility determination, however, we have put in place a requirement that will frequently trip up even the most diligent INS adjudicator. If, as in the case before us, the immigration judge makes no determination that the alien's testimony is not credible, this circuit "presume[s] that they have found the petitioner's testimony credible." *Artiga–Turcios*, 829 F.2d at 723.[1] Thus, to

---

1. In a similar case, the Seventh Circuit properly refused to go so far. *See Carvajal–Munoz v.*

*INS*, 743 F.2d 562 (7th Cir.1984). In *Carvajal–Munoz*, the "immigration judge made no specif-

proceed with deportation, an immigration judge must explicitly find the alien's testimony "incredible." The absence of an adversarial factfinding process [2] makes such a showing extremely difficult.

### III. *The Erosion of External Corroboration.*

A requirement that the immigration judge must find the alien's testimony incredible signals the further erosion of external corroboration requirements. Although the alien must "produce some evidence to show that persecution, if carried out, would be directed toward the alien as an individual," *Estrada v. INS*, 775 F.2d 1018, 1021 (9th Cir.1985), the alien may produce such evidence in our circuit by means of his own testimony. *See, e.g., Artiga–Turcios*, 829 F.2d at 723.

Such evidence is highly subjective, and being filtered through the lense of the alien's experience, it may be distorted. Accordingly, every circuit but this one has required external corroborating evidence. *See, e.g., Gumbol v. INS*, 815 F.2d 406, 409, 412 (6th Cir.1987) (finding petitioner's own testimony without more evidence insufficient to show clear probability of future persecution); *Cruz–Lopez v. INS*, 802 F.2d 1518, 1520–21 (4th Cir.1986) (following Seventh Circuit requirement that alien must offer specific facts that he "will more likely than not be singled out for persecution") (quoting *Carvajal–Munoz v. INS*, 743 F.2d 562, 573 (7th Cir.1984)); *Farzad v. INS*, 802 F.2d 123, 125 (5th Cir.1986) (per curiam) (finding petitioner's own testimony insufficient without external evidence of political dissidence for showing of persecution); *McLeod v. INS*, 802 F.2d 89, 93 (3d Cir. 1986) (requiring aliens to "present some

objective evidence establishing a realistic likelihood that he would be persecuted in his native land"); *Carvajal–Munoz*, 743 F.2d at 573 (requiring specific, objective facts that this particular alien is being singled out for persecution).

The case before us illustrates our failure to require corroboration. The letter would perhaps have been such evidence, but Mendoza is unable to produce it. We do not require its production. It is thus unlikely that Mendoza would prevail in any circuit but this one.

An equally troubling dimension of this erosion of external evidentiary requirements is that it underscores our departure from the general rule of deference to administrative decisions. The extent to which the other circuit courts of appeal disagree with our court's approach is well-illustrated by a recent decision of the Eleventh Circuit. Unlike the Ninth Circuit, that court deferentially reviews decisions of the executive branch in this field. In *Perlera–Escobar v. Executive Office for Immigration*, 894 F.2d 1292, 1299 (11th Cir.1990), the court recently upheld an order denying a withholding of deportation because it found no linkage between the persecution and the alien's "political opinion," as required by the statute. In a revealing passage, made all the more so by the striking difference it exposes between the approaches of these two circuits, the court stated:

> Where Congress has made either an explicit or an implicit delegation of authority to an agency to fill the gaps in a statute and to provide meaning to particular terms of a statute, we must give "considerable weight" to the executive department's construction. *See Chevron*

---

ic statement regarding petitioner's credibility." *Id.* at 577. The court permitted the alien's own statements as evidence with certain caveats: "Thus, while recognizing the potential for self-serving statements in this context, we accept petitioner's statements where they establish factual circumstances with specificity, are not speculative, and do not conflict with petitioner's other evidence." *Id.* As evidenced by the court's holding in favor of the INS, *see id.* at 580, the Seventh Circuit's standard is significantly different from the holding in this case,

which relies on a presumption of credibility. No other circuit appears to follow the Ninth Circuit's rule.

**2.** As already mentioned, the immigration system is not an adversary system. The job of the INS is not to deport every alien. Nor should it be. Rather, the INS should attempt faithfully to execute the will of Congress by withholding the deportation of, or granting asylum to, those who meet specific criteria.

[v. Natural Resources Defense Council, 467 U.S. 837 (1984)] at 843, 104 S.Ct. [2778] at 2781–82 [81 L.Ed.2d 694]. We "may not substitute our own construction for a reasonable interpretation" made by the BIA. Id.; see also INS v. Cardoza Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) ("in the process of filling 'any gap left, implicitly or explicitly, by Congress,' the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program."); Campos–Guardado v. INS, 809 F.2d 285, 289 (5th Cir. 1987) ("[W]e accord deference to the Board's interpretation of immigration statutes unless there are compelling indications that the Board's interpretation is wrong."). We conclude that the BIA's determination that neither the retribution Escobar fears from the guerillas for having deserted them nor the investigation that he fears the government will undertake and the punishment it might exact because of his association with the guerrillas constitutes "persecution ... on account of ... political opinion" is reasonable.

Id. at 1296–97 (footnote omitted).

We of the Ninth Circuit do not speak in those tones.

## IV. Political "Neutrality" as "Political Opinion."

We also differ from other circuits on the crucial question of what constitutes "persecution ... on account of ... political opinion." The Ninth Circuit has held that political neutrality is a political opinion for purposes of 8 U.S.C. § 1153(h). See, e.g., Maldonado–Cruz v. INS, 883 F.2d 788, 791 (9th Cir.1989). This holding eviscerates the political opinion requirement of the statute. It means that a politically inactive alien, and perhaps most illegal aliens are, may now gain the protection of asylum. Other circuits have not been blind to this distortion of the historical purposes of asylum. In a footnote, the Perlera–Escobar court made clear that it perceived a difference in legal standard between these two circuits:

Although [the] Maldonado–Cruz [district court opinion] has been reversed by the Ninth Circuit in Maldonado–Cruz v. INS, 883 F.2d 788 (9th Cir.1989), we still regard it as persuasive and as a statement of the BIA's position. In reversing the BIA's decision, the Ninth Circuit relied on its own decisions which hold that political neutrality is a political opinion within the meaning of the Act. This circuit has not adopted the Ninth Circuit's belief that political neutrality is a political opinion for purposes of the Act.

894 F.2d at 1297 n. 4.

As a concept of international law, political asylum developed in response to the need to protect persons from persecution by their government because they had performed political acts or held political opinions in defiance of the state. Authorities interpreting the Convention Relating to the Status of Refugees of 28 July 1951 ("Refugee Convention"), 189 U.N.T.S. 137, for example, hold two different views regarding the nature of political opinion necessary to qualify for refugee status. Neither encompasses political neutrality. According to S. Prakash Sinha, an international authority on asylum:

Where the nature of the offense is mixed, one point of view maintains that the Convention applies only to those cases where the political opinion of the individual involved is decisive of the nature and severity of his punishment, while another viewpoint holds that it is sufficient that he has committed the offense because of his political opinion.

S. Prakash Sinha, Asylum and International Law 103 (1971).

This core idea of political activism underlies the concept of "refugee" status. As Sinha notes, the key element of political opinion involves the "ruptur[ing] of the refugee's normal relationship between him and his state." In turn, this rupture results from a political controversy, which "may arise from his non-submission to a new government for various political reasons, or from acts of political persecution by the government of his state, or from his own political offenses." Id. at 97. We

distort the meaning of an important requirement for refugee status when we permit political aloofness to serve as an active "political opinion," that endangers its holder. It also demeans the true martyr for whom asylum was intended.

It is not likely this concurring opinion will alter either the statutory or case law with which it is concerned. Nonetheless, from time-to-time sightings should be taken to establish one's position. Our ship appears to be at some distance from the main fleet but no reefs or shoals appear dead ahead. As a passenger, I shall go below and hope for the best.