**Maiane MGOIAN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 97–70134.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1998.

Filed July 13, 1999

Stuart I. Folinsky, Los Angeles, California, for the petitioner.

Marion E. Guyton, United States Department of Justice, Washington, D.C., for the respondent.

Before: BRIGHT,* REINHARDT, and RYMER, Circuit Judges.

BRIGHT, Senior Circuit Judge:

Maiane Mgoian petitions this court for review of the Board of Immigration Appeals' ("BIA") denial of her application for asylum and refusal to withhold deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(a) and 1253(h), respectively. We have jurisdiction under 8

U.S.C. § 1105a(a),[1] and, for the reasons which follow, we grant her petition.

## I.

Maiane Mgoian is a Kurdish–Moslem citizen of Armenia. She was admitted to the United States as a non-immigrant visitor for pleasure on June 17, 1993. Under the terms of her visa she was authorized to stay here until December 31, 1993, but she remained in this country without permission beyond that date. She is therefore deportable under § 241(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B).

Mgoian filed her application for asylum and withholding of deportation on January 12, 1994 wherein she alleged that she suffered persecution in Armenia because of her Kurdish–Moslem heritage and would fear for her life if ever forced to return to her homeland. Nevertheless, on June 6, 1995, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause why she should not be deported.

At a hearing held on January 12, 1996, an Immigration Judge ("IJ") found Mgoian to be deportable, as charged, and denied her application. The IJ, while crediting Mgoian's testimony, failed to find an objective basis for her claim of past persecution and instead determined that any abuse she suffered in Armenia, although ethnically motivated, was merely harassment or discrimination and not persecution. *See* Admin.R. at 38–45.

Mgoian promptly appealed the IJ's decision to the BIA and argued two points: first, that the IJ erred in finding that she was not eligible for asylum; and second, that her right to a fair hearing had been denied when the IJ forced her attorney to admit that she was deportable. On Janu-

---

* The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

1. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), *amended by* Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, repealed 8 U.S.C. § 1105a (1994) and replaced it with a new judicial review provision. *See* IIRIRA § 306. As the new provision does not apply to proceedings that commenced before April 1, 1997, this Court has jurisdiction over this petition under 8 U.S.C. § 1105a. *See* IIRIRA § 309(c).

ary 15, 1997, the BIA rejected both of Mgoian's arguments and ordered her to depart voluntarily from the United States. The BIA agreed in principle with the IJ's determination that the harassment and discrimination suffered by Mgoian did not constitute past persecution. The BIA further concluded that Mgoian did not establish a well-founded fear of future persecution because she failed to "link" serious events targeting other members of her immediate family "in any meaningful way to her fear of being persecuted." Admin.R. at 6. The BIA also held that, although the IJ's rough handling of Mgoian's attorney was "troubling," Mgoian had not been prejudiced by her attorney's concessions. *See id.* at 3–4. In her petition before this court, Mgoian renews both arguments.

■ We have held that where an IJ expressly finds the testimony of an applicant to be credible, and where the BIA makes no finding to the contrary, we accept the testimony given before the IJ as undisputed. *See Singh v. Ilchert,* 63 F.3d 1501, 1506 (9th Cir.1995). Because that is the case here, we accept the following facts elicited at Mgoian's immigration hearing at face value.

Born and raised in present-day Armenia, Mgoian is a Kurdish–Moslem woman in her late twenties. She is highly educated, with a master's degree in Russian language and culture, and she is a member of what was once perhaps the single most prominent Kurdish–Moslem family in Armenia—a family that included a number of well-known physicians, academics and publishers.

Prior to the disintegration of the Soviet Union, ethnic prejudice and strife in Armenia were seemingly rare and, even though she is a member of a small minority that differs both racially and religiously from the majority of Armenia's population,[2]

Mgoian noticed no difference in how she was treated relative to her non-Kurdish Armenian peers. In post-Soviet Armenia, however, tolerance for minority groups diminished greatly. Because of her family's place as perhaps the most prominent of the Kurdish intelligentsia, the Mgoians were among the "first who became a target." Admin.R. at 62.

In the months before she came to the United States, Mgoian was personally (and repeatedly) insulted and threatened by her Armenian neighbors. She received these threats both face-to-face and over the telephone. While she was never physically attacked, her tormentors suggested, in essence, that: she should leave Armenia; that people like her were unwelcome there; and that, if she did not leave of her own accord, she would be forced to do so.

Mgoian also testified at her asylum hearing that many of her closest relatives had been the victims of direct, and even deadly, attacks. Her uncle, Said Eboian, a famed physician and educator, was murdered in his office. A witness to that crime was harassed into silence and, according to Mgoian, the government never investigated the murder or prosecuted Eboian's assailant. A second uncle, Sharko Mgoian, a distinguished history professor, fled to Russia after his office was twice ransacked and he received persistent death threats. Yet a third uncle, Agit Mgoian, publisher of a Kurdish newspaper, also left Armenia for Belarus after the Armenian government forcibly closed his paper. Finally, Mgoian's father, Georgi Mgoian, also a widely respected physician, fled to the Republic of Georgia with her mother after repeated threats on their lives. In short, Mgoian testified that virtually all of her surviving family had been forced to leave Armenia, under threat, in order to find refuge in other countries.

---

**2.** Armenia has a total population near three million, of whom approximately ninety percent are both racially Armenian and religiously Christian. As of 1990, only an estimated 10,000 Kurdish–Moslems were resident in Armenia. After the collapse of the Soviet empire that number fell to approximately 1,000. Admin.R. at 69.

Mgoian testified that the Armenian government had done nothing to combat or redress attacks on its Kurdish citizens. Instead, it chose to turn a blind eye and "just wash [its] hands" of them. Admin.R. at 70.

In addition to Mgoian's oral testimony, the record contains documentary evidence including: Mgoian's affidavit; several notarized translations from the Armenian newspaper "Henchak Haystan"; an August 1995 State Department Profile of Asylum Claims for Armenia; and a 1995 Amnesty International Report on Armenia. While Mgoian's affidavit essentially restates the substance of her oral testimony, the other documents do add additional insight into her claim for asylum.

The newspaper translations (*see generally*, Admin.R. at 100–12)—excerpts though they are—suggest that Armenian–Kurds have become convenient scapegoats for many of the ills that have befallen Armenia since 1991. The excerpts, dated from 1994 and 1995, paint the Kurds in dehumanizing terms as "non-Armenian" and "illiterate", as "wolves" and "snakes", as "cunning" and "fearless, with criminal inhumanity." The excerpts also describe attacks on Kurds in general terms and draw specific and inflammatory connections between the Kurds and other acknowledged enemies of Armenia: the Kurds are said to be under the influence of Azerbaijan[3] and complicit in the Turkish-led genocide of Armenians in the early part of this century. Specifically, the newspapers blame the Kurdish "intelligentsia" for such evils. *See id.* at 112.

For its part, the State Department Profile notes the wide-spread political turbulence in post-Soviet Armenia and specifically comments that "[i]n recent months, there have been disturbing indications of declining tolerance for political opposition and for religious diversity." Admin.R. at 118. The Profile, as a whole, focuses primarily on those asylum claims likely to be made by Christian Armenians seeking bet-

ter economic conditions in the United States and it mentions the Kurds only in passing. In a brief section, the Profile notes that "[t]he small communities of Russians, Jews, *Kurds*, Yezids, Georgians, Greeks and Assyrians [who are] *still resident* in Armenia do not complain of discrimination." Admin.R. at 123 (emphasis added) (implying that many in those communities have already left Armenia). Nevertheless, the Profile makes no explicit mention of persecution aimed at Kurdish–Moslems in Armenia.

Finally, the Amnesty International Report describes incidents that corroborate the claims of persecution by minority groups in Armenia. The Report asserts, *inter alia*, that "members of religious minorities have been physically assaulted by people they strongly believe have links with official structures, and [have been involved] in incidents they feel have not been sufficiently rigorously investigated by the police." Admin.R. at 29. The Report does not, however, discuss specific claims of persecution targeting Armenian–Kurds *per se.*

## II.

When the BIA has conducted its own review of the record, as is the case here, we review the BIA's decision rather than the IJ's. We review the BIA's factual conclusions regarding asylum eligibility under a substantial evidence standard, and we reverse only if the evidence presented to the BIA was so compelling that no reasonable trier of fact could fail to find the requisite fear of persecution. *See I.N.S. v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Garrovillas v. I.N.S.*, 156 F.3d 1010, 1013 (9th Cir.1998). Although the basis for our review is limited to the administrative record, we consider that record in its entirety, including evidence which contradicts the BIA's findings. *See*

---

**3.** Azerbaijan, which is predominately Moslem, fought a bloody war with Armenia in the early–1990's over the enclave of Nagorno–Karabakh.

*Velarde v. I.N.S.*, 140 F.3d 1305, 1309 (9th Cir.1998).

 The Attorney General has discretion to grant asylum to refugees. *See* 8 U.S.C. § 1158(a)-(b). A "refugee" is defined under the INA as a person "who is unable or unwilling to return to ... [her home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An asylum applicant's well-founded fear of persecution must be both subjectively genuine and objectively reasonable to qualify for asylum. *See Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir.1998). An alien satisfies the subjective component by credibly testifying that she genuinely fears persecution. *Id.* An alien generally satisfies the objective component in one of two ways: either by establishing that she has suffered persecution in the past or by showing that she has a good reason to fear future persecution. Furthermore, such persecution must be "on account of" one of the protected grounds listed in the statute. Because, as we explain below, we conclude that the evidence in the record compels the conclusion that Mgoian has good reason to fear future persecution, we need not review the BIA's finding that her past experiences did not rise to the level of persecution.

 In this case, there is no question that Mgoian's fear of persecution, should she be forced to return to Armenia, is genuine. The IJ found it to be so. *See* Admin. R. at 43 (IJ stating that "I am certainly persuaded that the respondent is fearful of returning to Armenia."). Thus,

the record compels the conclusion that Mgoian has satisfied the subjective component of the "well-founded fear" test.

 The objective component of the standard requires a more rigorous test however. The applicant must present "credible, direct, and specific evidence in the record of facts that would support a *reasonable* fear" of persecution. *Rodriguez–Rivera v. United States Dep't. of Immigration and Naturalization*, 848 F.2d 998, 1002 (9th Cir.1988) (emphasis in original). Thus, the question is whether Mgoian presented sufficient evidence to support a finding of a reasonable fear of persecution in a similarly situated applicant.

 In order to clear this hurdle, an applicant may not "simply prove that there exists a generalized or random possibility of persecution in [her] native country; [she] must show that [she] is at particular risk—that [her] predicament is appreciably different from the dangers faced by [her] fellow citizens." *Kotasz v. I.N.S.*, 31 F.3d 847, 852 (9th Cir.1994) (internal quotation marks omitted). On the other hand, the applicant is not required to show that "[she] would be singled out individually for persecution if ... there is a pattern or practice ... of persecution of groups of persons similarly situated" and she can "establish[ ][her] own inclusion" in the group "such that [her] fear of persecution upon return is reasonable." *Kotasz*, 31 F.3d at 853 n. 8 (quoting 8 C.F.R. § 208.13(b)(2)(i)). Thus, if Mgoian is able to show a "pattern or practice" of persecution against a group of which she is a member, then she will be eligible for asylum. *See id.* at 853.[4]

---

4. Failing that, if the applicant is a member of a "disfavored" group, but the group is *not* subject to systematic persecution, this court will look to (1) the risk level of membership in the group (i.e., the extent and the severity of persecution suffered by the group) and (2) the alien's individual risk level (i.e., whether the alien has a special role in the group or is more likely to come to the attention of the persecutors making him a more likely target for persecution). *See Kotasz*, 31 F.3d at 853.

The relationship between these two factors is correlational; that is to say, the more serious and widespread the threat of persecution to the group, the less individualized the threat of persecution needs to be. *See id.* at 853–54. Because we conclude that Mgoian effectively established a pattern or practice claim with respect to her family group and its inclusion in Kurdish–Armenia's intelligentsia, it is unnecessary for us to pursue this alternative analysis.

 As we have noted, this "group" of similarly situated persons is not necessarily the same as the more limited "social group" category mentioned in the asylum statute. *See id.* at 852 n. 7. In this context, we have held that a " 'particular social group' implies a collection of people closely affiliated with each other," with the "prototypical example of a 'particular social group' [ ] consist[ing] of the immediate members of a certain family...." *Sanchez–Trujillo v. I.N.S.,* 801 F.2d 1571, 1576 (9th Cir.1986); *see also, Hernandez–Ortiz v. I.N.S.,* 777 F.2d 509, 516 (9th Cir.1985) (observing that a family is by definition a "small, readily identifiable group"). Thus, it should now be clear that a pattern of persecution targeting a given family that plays a prominent role in a minority group that is the object of widespread hostile treatment supports a well-founded fear of persecution by its surviving members.

Indeed, in the past we have explicitly held that an individual applicant may be eligible for asylum, even in the absence of direct persecution against her personally, if she is able to demonstrate a well-founded fear of persecution based on acts of violence against her friends or family members. *See Arriaga–Barrientos,* 937 F.2d at 414; *Hernandez–Ortiz,* 777 F.2d at 515 ("[t]he fact that there have been a number of threats or acts of violence against members of an alien's family is sufficient to support the conclusion that the alien's life or freedom is endangered"); U.N. Refugee Handbook on Procedures and Criteria for Determining Refugee Status, ¶ 43 (evidence concerning relatives may well show that an applicant's fear of persecution is well-founded). Such violence must, however, "create a pattern of persecution closely tied to the [applicant]." *Arriaga–Barrientos,* 937 F.2d at 414.

The BIA's conclusion that Mgoian failed to "link" serious events targeting other members of her immediate family "in any meaningful way to her fear of being persecuted" is not supported by substantial evidence. The record in this case, when examined in its totality, shows Mgoian has fully demonstrated that acts of violence occurred against her family members and that those acts are sufficiently connected to her personally to justify a well-founded fear of persecution in any person similarly situated. Any reasonable factfinder would be compelled to so find.

 The most extreme act of violence experienced by Mgoian's family was the murder of her Uncle Said. While it is true that "the death of one family member does not [automatically] trigger a sweeping entitlement to asylum eligibility for all members of her extended family," *Echeverria–Hernandez v. U.S. I.N.S.,* 923 F.2d 688, 691 (9th Cir.1991), *vacated on other grounds by Echeverria–Hernandez v. U.S. I.N.S.,* 946 F.2d 1481 (9th Cir.1991), Mgoian has shown much more than mere isolated violence. Additional evidence presented showed that all of Mgoian's principal family members were subjected to forms of violence, persecution and harassment as members of the Kurdish–Moslem intelligentsia, which evidence gives rise to the reasonable inference that the Mgoians, as a family, have become specific targets of those with a generalized hatred of Kurdish–Moslems in Armenia.

While it is not fully clear that the Armenian government is itself responsible for the violence against her family, Mgoian did testify credibly to the government's failure to pursue an investigation into her Uncle Said's murder and to the regime's role in shutting down her Uncle Agit's newspaper. These claims are bolstered by Amnesty International's Report which indicates that the Armenian government has been unresponsive to violence and persecution aimed at other members of the country's religious minorities. Taken together, these unrebutted pieces of evidence make it plain that the Armenian government is unwilling or unable to control those elements of its society responsible for targeting the Mgoians. *See Arteaga v. I.N.S.,* 836 F.2d 1227, 1231 (9th Cir.1988) (holding that evidence of state action is not necessarily required in order to establish persecution, or a well-founded fear thereof,

when the government is unable or unwilling to control the acts of private groups).

Moreover, Mgoian presented persuasive evidence to explain *why* her family was singled out. The newspaper extracts contained in the record of this case reveal that the Kurdish–Moslem intelligentsia is viewed as an enemy of the Armenian nation. The Mgoian family, as highly educated people, and as prominent and acknowledged leaders of Armenia's Kurdish–Moslem population, are uniquely conspicuous and obvious targets.

Mgoian also presented ample proof that the violence against her family members is "closely tied" to her. While all Kurdish–Moslems may face some danger in Armenia at present because of the declining tolerance for political opposition and religious diversity, Mgoian's predicament is appreciably different. She is similarly situated to her family members who have suffered persecution: she has been threatened because she is a Kurdish–Moslem, a member of the intelligentsia, and a member of a family marked for violence. To the extent that she remains immutably a member of that group, violent acts against other members of the group put her on notice that she may be next. Indeed, if she is forced to return against her will, she will be the last of the Mgoians in Armenia and, therefore, at particular risk. Finally, Mgoian has been directly and repeatedly threatened by her Armenian neighbors, who suggested that if she did not leave the country of her own accord, she would be forced to do so. Taken together, we believe that these facts provide a sufficient nexus between Mgoian personally and the violence against her family.

The IJ's determination and the BIA's affirmance that Mgoian experienced merely innocuous discrimination is not "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Prasad v. I.N.S.*, 47 F.3d 336, 338 (9th Cir.1995). The suffering in-

flicted on the Mgoian family because of its Kurdish–Moslem heritage in a land of Armenian Christians was not simply a "minor disadvantage or trivial inconvenience." *Kovac v. I.N.S.*, 407 F.2d 102, 107 (9th Cir.1969). Instead, that suffering led virtually the entire Mgoian family to flee Armenia and now puts Mgoian herself in mortal fear. In short, the violent and harassing actions of a segment of Armenian society bent on ethnic cleansing— actions which targeted Mgoian and her family for their prominent role as intellectuals in a small and vulnerable minority— would induce any person so situated to have a reasonable and "well-founded fear" of persecution. In our view, no reasonable factfinder who fairly considered the evidence could have found otherwise.[5]

▮ In addition to her application for asylum, Mgoian requested withholding of deportation. The Attorney General must withhold deportation if an alien's "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). To obtain withholding of deportation, the applicant must demonstrate that it is more likely than not that she will be persecuted by the government or a group that the government cannot or will not control. *Mendoza Perez v. U.S. I.N.S.*, 902 F.2d 760, 761 (9th Cir.1990). Given the pattern of persecution closely tied to Mgoian and the ongoing harm inflicted upon Kurdish–Moslems in Armenia, we conclude that Mgoian has established that it is more likely than not that she would be persecuted were she to return to Armenia.

### III.

In conclusion, we hold that the BIA's denial of eligibility for asylum was not supported by substantial evidence in the record. Any reasonable factfinder would be compelled to find that Mgoian has a

5. Since we grant Mgoian relief on this basis, it is unnecessary for us to consider her second claim—namely that the proceedings against

her should have been abandoned because the IJ "coerced" a concession of deportability from her attorney.

well-founded fear of future persecution. Moreover, Mgoian is entitled to withholding of deportation. *See Vallecillo–Castillo v. INS,* 121 F.3d 1237, 1240 (9th Cir.1996). We grant Mgoian's petition for review and reverse the BIA's decision. We REMAND the case to the BIA. The Board is directed to grant Mgoian's petition for withholding of deportation, and, with respect to the petitioner's asylum application, to exercise its discretion under § 208 of the INA, 8 U.S.C. § 1158(a).

RYMER, Circuit Judge, dissenting:

I dissent because the majority has put a spin on the record that the record does not compel—contrary to *I.N.S. v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); has substituted its own judgment of the facts for the BIA's—which may be felicitous in this particular case but is nevertheless contrary to our obligation to be "highly deferential" to the BIA's determinations, *see Marcu v. INS,* 147 F.3d 1078, 1080 (9th Cir.1998); and has reinvented the meaning of "group," *see* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b)(2)(i),[1] and of government accountability, *see Singh v. INS,* 94 F.3d 1353, 1359–60 (9th Cir.1996).

The majority reverses because of its conclusion that the "violent and harassing actions of a segment of Armenian society bent on ethnic cleansing ... targeted Mgoian and her family for their prominent role as intellectuals in a small and vulnerable minority." *See ante* at 1037. In turn, this conclusion flows from the premise that Mgoian is "similarly situated" to members of her family; her family is Kurdish, Moslem, and intelligent; violence marked some members of the family; therefore, "she may be next." *See id.* at 1037. However, as the BIA found, there is no link between Mgoian, anything that happened to her relatives, and any protected characteristic. That being so, it cannot be enough to compel a finding of well-founded fear of persecution that Mgoian is "similarly situated" to her family (who, like many families, share the same last name, ethnicity, religion, and intelligence) or "remains immutably a member of that group." *See id.* As the majority recognizes, "this 'group' of similarly situated persons is not necessarily the same as the more limited 'social group' category mentioned in the asylum statute." *See id.* at 1035–36. But if not, what is it? There can be no basis for finding a well-founded fear of persecution unless the group (whatever it is) has been persecuted by the government or by forces beyond its control on account of a trait such as ethnicity, religion, or political beliefs that are common to the entire group. And there is no evidence of that here.

---

1. 8 U.S.C. § 1101(a)(42)(A) defines "refugee" as a person unwilling to return to her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

 8 C.F.R. § 208.13, "Establishing asylum eligibility," states in relevant part:

 (b)(2) Well-founded fear of persecution. An applicant shall be found to have a well-founded fear of persecution if he or she can establish first, that he or she has a fear of persecution in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion; second, that there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and third, that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country because of such fear.... [T]he asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

 (i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

 (ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

As Mgoian testified, her Uncle Said was murdered with no known motive; her Uncle Sharko was threatened, perhaps because of his political views, with which neither she nor others in the family are (or appear to be) associated; her father, a physician, was likewise threatened but possibly on account of the death of a child under his care; and her Uncle Agit's paper was shut down, but there is no explanation why.

While mistreatment of relatives may *support* a well-founded fear of persecution, there must be some tie to the petitioner's fear for her own safety and far more than unconnected incidents involving the alien's family in order to *compel* it. In *Arriaga–Barrientos v. U.S. I.N.S.,* 937 F.2d 411 (9th Cir.1991), for example, it was insufficient that two brothers had been abducted "by unknown gunmen for unknown reasons." *Id.* at 414. The harm that befell Mgoian's uncles was from unknown people for unknown (and for all the record discloses, different) reasons. On the other hand, we have thought it sufficient to impute a family's political views to a neutral member when six cousins, two brothers, one half-brother and two uncles had actively engaged in guerilla activities for which they and other family members had been persecuted; the petitioner's family had a reputation for pro-guerilla sympathies; and the petitioner had visited family members held as political prisoners and had registered under her own name on prison records, thereby putting herself at particular personal risk. *See Ramirez Rivas v. INS,* 899 F.2d 864 (9th Cir.1990). Here, there is no evidence that what happened to Mgoian's relatives happened because they were "Mgoians," or because they were Kurdish and Moslem, prominent and intelligent. While the BIA arguably could have inferred a common denominator and inferred that Mgoian's relatives were targeted on account of it, it did not do so and certainly did not *have* to do so. There is no evidence that whatever her relatives did or thought would realistically be attributed to Mgoian herself. In these circumstances, the mere fact of belonging to a

well-educated Kurdish–Moslem family, some of whom have been victims of violence or threatened violence from unknown sources and for unknown reasons, cannot qualify for membership in a "group[ ] of persons similarly situated" for purposes of showing a well-founded fear of persecution.

Nor is an unsolved murder and a newspaper shut down from unrelated causes sufficient to compel a finding that the Armenian government "is unwilling or unable to control those elements of its society responsible for targeting the Mgoians." *See ante* at 1037. "Those elements" are nowhere identified. Beyond that, there is no evidence tending to show, let alone to compel a finding that there was a non-random, systematic campaign orchestrated against *the Mgoian family* on account of their race, ethnicity, religion, membership in a particular social group, or political opinion. This leaves only the general violence and upheavals that, according to the State Department Profile, plague Armenian society. However, as the BIA found, nothing in the evidence distinguishes Mgoian herself from other Kurdish–Moslems "still resident in Armenia [who] do not complain of discrimination." Admin.R. 123 (U.S. Dep't of State, Armenia—Profile of Asylum Claims and Country Conditions, at 8). That finding is supported in the record. Mgoian testified that she would expect to be harassed by neighbors if she returns to Armenia because harassment is a fact of life in her country. Without question, this is an unpleasant prospect. But the record in this case does not compel the conclusion that suffering "inflicted on the Mgoian family because of its Kurdish–Moslem heritage in a land of Armenian Christians" "now puts Mgoian herself in mortal fear." *See ante* at 1037. Mgoian testified that she came to this country to visit a friend, strengthen her English and tour California, and that she planned to return home. She only changed her mind when she found out that her parents had left while she was away

and she did not want to go back because her family was no longer there.

The BIA was not compelled to ignore Mgoian's testimony or to draw inferences that cut either way. Given the narrow scope of our review, and substantial evidence in the record that supports the BIA's determination, I would deny the petition.