Mihaly KOTASZ, Agnes Horvath Kotasz, Matyas Kotasz, and Erika Kotasz, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 92–70268.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1993.

Decided Aug. 1, 1994.

Eleanor T. Bregman, San Diego, CA, for petitioners.

Allen W. Hausman, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: REINHARDT, T.G. NELSON, Circuit Judges, and KAUFMAN,* District Judge.

REINHARDT, Circuit Judge:

Mihaly and Agnes Kotasz, husband and wife, and their two children, Matyas and Erika, petition for review of the Board of Immigration Appeals' ("BIA") decision denying their applications for asylum and withholding of deportation. All four members of the Kotasz family are natives and citizens of Hungary.

Although the BIA did not question the reliability of evidence showing that Mihaly Kotasz ("Mihaly") was arrested and beaten on several occasions by the Hungarian police because of his active opposition to the Hungarian communist government, it denied Mihaly's asylum request. The BIA based its denial of asylum on the fact that Mihaly was arrested "along with numerous other demonstrators," and thus, in its view, was not "singled out" for persecution.[1] Similarly, the BIA denied the asylum claim of Agnes Kotasz ("Agnes"), which was based on her ethnic status as a gypsy, because it found that she had not been individually targeted for persecution. Because we find that, as to Mihaly, the BIA erred in its application of the requirement of a particularized threat of persecution, we grant the Kotaszes' petition in part and deny it in part, and remand to the BIA for further proceedings.

## I.

As the BIA acknowledged in its opinion, Mihaly is anti-communist. More specifically, he strongly opposed the Hungarian communist government. Mihaly's father took part in the 1956 Hungarian uprising. Mihaly himself was forced to serve at a labor camp for a year and a half because of his refusal to serve in the Hungarian military. Subse-

---

* The Honorable Frank A. Kaufman, Senior United States District Judge for the District of Maryland, sitting by designation.

1. Although the Kotaszes fled Hungary in 1987, when the communist regime was still firmly in place, the regime fell and democratic elections were held prior to the Kotaszes' 1990 deportation hearing. As a result, the BIA took administrative notice of these democratic changes, dis-

cussing the fall of the communist regime in its opinion denying the Kotaszes' asylum claim. Whatever the current state of the political climate in Hungary, we must nonetheless remand the Kotaszes' case because the BIA did not rely on the change in government as an independent basis for its decision. *See* discussion *infra* note 14.

quently, to show his opposition to the communist regime, Mihaly participated in several annual demonstrations commemorating the 1848 Hungarian Revolution. At each of these peaceful demonstrations—on March 15 of 1981, 1984, 1985 and 1986—Mihaly was arrested by the police. Ten to twenty other demonstrators were usually arrested along with him; they would be detained and, at intervals during detention, beaten by the police. The police hit Mihaly in his stomach and kidneys with a rubber truncheon, and called him an anti-communist. Each time Mihaly was detained he suffered one or two days of such treatment and was then released.

The Kotaszes entered the United States on December 5, 1987, as nonimmigrant visitors. Mihaly immediately applied for political asylum and withholding of deportation on behalf of himself and his family; his application described his history of arrests and beatings. Agnes filed a separate asylum application in which she described the discrimination faced by gypsies in Hungary. After certain procedural complications, the Kotaszes' deportation hearing was held on May 17, 1990.

▄▄▄ At the hearing, both Mihaly and Agnes Kotasz testified in support of their asylum applications.[2] Agnes' testimony was extremely brief: she stated only that in Hungary she was ashamed to admit that she was a gypsy. Mihaly testified at much greater length, describing his mistreatment at the hands of the Hungarian government. He asserted that because of his past political activities he would have "great difficulty" if he returned to Hungary. When questioned about then-recent political changes in Hungary, Mihaly asserted that political harassment continued there because, despite the superficial change of government system, the same people were in power and the same thinking prevailed as under Communism.[3] The immigration judge found his testimony generally credible, but denied the Kotaszes' asylum and withholding of deportation claims and granted them voluntary departure. The BIA affirmed in a three-page disposition.

The BIA found that neither petitioner had proven the particularized persecution necessary to demonstrate statutory eligibility for asylum under the INA. In its opinion, the BIA stated with regard to Mihaly that "there is no evidence in the record that [he] was singled out for persecution—rather he was arrested with numerous other demonstrators and incarcerated for a short period of time." Regarding Agnes' asylum claim, the BIA found that "there is no evidence that she, as an individual, has been persecuted owing to her ethnic background." Finally, after rejecting the Kotaszes' claims of persecution,

---

2. The Kotaszes have challenged the competency of the translation provided at their deportation hearing, asserting that it was deficient and at times "nonsensical." It is well established that aliens have a Fifth Amendment due process right to a full and fair hearing in deportation proceedings. *Cuadras v. INS*, 910 F.2d 567, 573 (9th Cir.1990). If the alien does not speak English fluently, the presence of a competent interpreter is critical to the fairness of a hearing. *Tejeda–Mata v. INS*, 626 F.2d 721, 726 (9th Cir.1980), *reh'g en banc denied*, 665 F.2d 269 (1981), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982). In order to make out a due process violation, however, the alien must show that "a better translation would have made a difference in the outcome of the hearing." *Acewicz v. U.S. I.N.S.*, 984 F.2d 1056, 1063 (9th Cir.1993). Here, while claiming that their words were not translated correctly, the Kotaszes have not specified which, if any, words would have been translated differently, given a more competent interpreter. Moreover, the record in this case demonstrates that, despite some disagreement over the translation of specific phrases, the Kotaszes were given a fair opportunity to relate their version of events. Clarification or repetition was at times required, but in each instance the misunderstanding was rectified to the apparent satisfaction of the parties. Accordingly, we cannot find that faulty translation influenced the outcome of the proceedings. *See Hartooni v. INS*, 21 F.3d 336, 340 (9th Cir.1994).

3. While we do not reach this issue, it is interesting to note that recent events lend some support to Mihaly's position. The Hungarian Socialist party won a clear 15–seat majority in the May 1994 parliamentary elections and has chosen Gyula Horn, Hungary's last Communist foreign minister, to be the new prime minister. *See, e.g.*, D. Ottaway, *Hungary's New Premier a Reformed Communist; Horn Trying to Live Down Role in '56 Revolt*, Wash. Post, June 5, 1994, at A29; J. Perlez, *Man in the News: Gyula Horn, Recycled Communist, To Lead Hungary*, N.Y. Times, June 5, 1994, at A3; J. Perlez, *Welcome Back, Lenin; As Capitalist Vagaries Rattle East Europe, Voters Reinstall Some Familiar Faces*, N.Y. Times, May 31, 1994, at A1.

the BIA took administrative notice of the political changes in Hungary, noting that a "western-style parliamentary democracy" had been instituted and that the Communist Party was no longer in power.[4]

This petition for review ensued.

## II.

### A.

We review legal questions regarding the requirements for establishing eligibility for asylum de novo. *Abedini v. INS*, 971 F.2d 188, 190 (9th Cir.1992). Factual findings supporting the BIA's asylum determination, including whether the alien has demonstrated a well-founded fear of persecution, are reviewed under the "substantial evidence" standard. *Id.* at 191.

An alien who seeks judicial reversal of the BIA's eligibility determination "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, —— U.S. ——, ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992), *rev'g* 921 F.2d 844 (9th Cir.1990) (reversing BIA and holding that petitioner established his statutory eligibility for asylum). This strict standard bars the reviewing court from independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown. It does not, however, preclude a court from vacating the BIA's asylum determination and remanding a case for further consideration where the BIA's denial of asylum was based upon an error of law. *See, e.g., Castillo–Villagra v. INS*, 972 F.2d 1017, 1031 (9th Cir.1992); *Rivas–Martinez v. INS*, 997 F.2d 1143, 1146 (5th Cir.1993); *Yepes–Prado v. INS*, 10 F.3d

1363, 1366, 1370 (9th Cir.1993). When we remand due to the BIA's legal error, we allow the BIA to exercise its judgment and administrative expertise using the appropriate legal standards. In such cases—unless, of course, compelling evidence of persecution exists—we do not instruct the BIA as to any required outcome on remand. *See, e.g., Castillo–Villagra*, 972 F.2d at 1031.

### B.

Section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a), provides that any alien is eligible for asylum who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The "well-founded fear" standard has both a subjective and objective component. *INS v. Cardoza Fonseca*, 480 U.S. 421, 430–31, 107 S.Ct. 1207, 1212–13, 94 L.Ed.2d 434 (1987). The subjective component requires only that the alien's fear be genuine. *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir.1988). The objective component requires "credible, direct, and specific evidence in the record of facts that would support a *reasonable* fear" of persecution. *Rodriguez–Rivera v. INS*, 848 F.2d 998, 1002 (9th Cir.1988) (per curiam) (emphasis in original).

### C.

A requirement that the alien show that he faces a particularized threat of persecution—sometimes referred to, especially in BIA opinions, as a requirement that the alien show that he will be "singled out" for persecution [5]—is encompassed within the

---

4. *See* discussion *supra* note 1 and *infra* note 13.

5. The Supreme Court's only mention of the "singled out" requirement has been by way of quoting from opinions of the BIA and of the circuit courts. *See INS v. Stevic*, 467 U.S. 407, 411 & n. 3, 104 S.Ct. 2489, 2491, n. 3, 81 L.Ed.2d 321 (1984) (quoting BIA decisions at issue); *Cardoza Fonseca*, 480 U.S. at 453 n. *, 107 S.Ct. at 1224 n. * (describing various formulations of the well-founded fear standard and quoting *Carvajal–Munoz v. INS*, 743 F.2d 562, 574 (7th Cir.1984)).

The requirement has never been construed by the Court, nor was it even mentioned in *Elias–Zacarias*, the Court's most recent asylum decision.

In describing the well-founded fear standard, this court and other courts have on occasion relied on the formulation. *See, e.g., Abedini*, 971 F.2d at 192 n. 1 (stating that alien must show that government's persecution "stemmed from its desire to single him out for unique punishment because of his ... political or religious beliefs"); *Mendoza Perez v. INS*, 902 F.2d 760,

well-founded fear standard. Although we have expressed this requirement using various formulations,[6] the underlying idea has remained constant: the petitioner cannot simply prove that there exists a generalized or random possibility of persecution in his native country; he must show that he is at particular risk—that his "predicament is appreciably different from the dangers faced by [his] fellow citizens." *Vides–Vides*, 783 F.2d at 1469. *See also Zepeda–Melendez v. INS*, 741 F.2d 285, 290 (9th Cir.1984) (affirming BIA denial of asylum because danger facing petitioner was "the same as faced by other Salvadorians"); *Rebollo–Jovel v. INS*, 794 F.2d 441, 448 (1986).

*Vides–Vides* and other such cases involved citizens of El Salvador who sought asylum during a period of political turmoil in their native country. In the Salvadorian cases, we ruled in favor of the petitioner only when he showed that for one reason or another he was subject to particular danger. *See Zavala–Bonilla v. INS*, 730 F.2d 562, 564–67 (9th Cir.1984) (reversing BIA ruling against Salvadorian who actively participated in union activities, and was confronted by police during controversial strike); *Aviles–Torres*, 790 F.2d at 1435 (reversing BIA ruling against Salvadorian labeled a "guerilla" in newspaper article); *Canjura–Flores v. INS* 784 F.2d 885, 888 (9th Cir.1985) (reversing BIA ruling against Salvadorian who was active member of leftist organization, and who had been sought by National Guard). It is important to note, however, that underlying our approach was our determination that, despite the widespread political violence that existed in El Salvador during this period, neither all Salvadorians nor all rebel sympathizers were systematically persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.

There are, in contrast, more extreme situations in which members of an entire group—though perhaps not of an entire nation—*are* systematically persecuted. In such cases, group membership itself subjects the alien to a reasonable possibility of persecution, so that he or she will be able to satisfy the objective component of the well-founded fear standard simply by proving membership in the targeted group.[7] As the systematic attempt to annihilate the Jews in Nazi Germany conclusively demonstrates, persecution of an entire group can render proof of individual targeting entirely superfluous. Certainly, it would not have been necessary for each individual Jew to await a personal visit to his door by Nazi storm troopers in order to show a well-founded fear of persecution. Similarly, it would be unnecessary for members of other systematically persecuted groups to show that they have been selected on an individual basis as subjects of persecution.

After years of BIA opinions emphasizing "singling out" and "individual targeting," the INS belatedly recognized group persecution as sufficient in itself to establish eligibility for asylum in certain circumstances. In 1990, the INS adopted a regulation providing that where members of a given group are systematically persecuted—that is, where a pattern or practice of persecution exists—proof of group membership suffices to establish a "well-founded fear." *See* 8 C.F.R.

---

762 (9th Cir.1990) (alien was "singled out and sought by" men believed to be guerillas); *Vides–Vides v. INS*, 783 F.2d 1463, 1467–68 n. 2 (9th Cir.1986) (concluding that alien petitioner "has failed to show that he will be singled out for persecution"); *Aviles–Torres v. INS*, 790 F.2d 1433, 1436 (9th Cir.1986) (describing newspaper article as "singling out petitioner" for persecution); *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1579 (9th Cir.1986) (quoting BIA opinion); *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir.1985) (quoting *Carvajal–Munoz*); *Moosa v. INS*, 760 F.2d 715, 719 (6th Cir.1985); *Dally v. INS*, 744 F.2d 1191, 1196 (6th Cir.1984).

**6.** Besides using the phrase "singled out"—a formulation more commonly employed by the BIA than by this court—we have spoken of persecution being, for example, "directed at" the petitioner (*see Aviles–Torres v. INS*, 790 F.2d 1433, 1435 (9th Cir.1986)), being "targeted at him individually" (*see Mendoza Perez*, 902 F.2d at 762), or being "aimed at him in particular" (*see De Valle v. INS*, 901 F.2d 787, 791 (9th Cir.1990) (quoting *Sanchez–Trujillo*, 801 F.2d at 1581)).

**7.** Our use of the term group should not be confused with the INA's use of the phrase "particular social group," a term of art whose scope is considerably more circumscribed. *See* 8 U.S.C. § 1101(a)(42); *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986).

§ 208.13(b)(2)(i).[8] We should note, preliminarily, that the INS's views as expressed in this regulation are patently correct. Nonetheless, we must also note that the regulation is, deliberately, far from comprehensive: it does not purport to cover the entire range of persecution related to group membership. Rather, the regulation leaves the standards governing non-pattern or practice cases to be developed through case law, as before.

Although past and even present-day events show that the INS has rightly attempted to deal with the problem of systematic persecution of members of oppressed groups, the problem of non-pattern and practice persecution of members of such groups is far more common. In such instances, although members of the disfavored groups are not threatened by systematic persecution of the group's entire membership, the fact of group membership nonetheless places them at some risk. That risk can rise to the level required for establishing a well-founded fear of persecution either as a result of an individual's activities in support of the group, or because an individual is a member of a certain element of the group that is itself at greater risk of persecution than is the membership of the group as a whole.

Group membership is an aspect of nearly all asylum claims, not a special problem limited to pattern or practice cases. To begin with, the Refugee Act's bases for asylum eligibility refer almost exclusively to groups. Specifically, a petitioner must face persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1158(a). The first four categories enumerated in the statute obviously relate to group characteristics, and even the category of persecution on account of political opinion is largely group-based, although the group may not be formally structured or easily defined.[9] Proof that the government or other persecutor has discriminated against a group to which the petitioner belongs is, accordingly, *always* relevant to an asylum claim. *See, e.g., Hartooni v. INS*, 21 F.3d 336, 341 (9th Cir.1994) (where petitioner an Armenian Christian, emphasizing that the small community of Armenian Christians in Iran has been "singled out for mistreatment"); *Mendoza Perez v. INS*, 902 F.2d 760, 762 (9th Cir.1990) (finding it significant that "others who worked for [petitioner's] organization were killed"); *Blanco–Comarribas v. INS*, 830 F.2d 1039, 1043 (9th 1987) (describing petitioner's membership in the "Nicaraguan Christian Youth, a Catholic group persecuted for demonstrating against the government in public"); *Damaize–Job v. INS*, 787 F.2d 1332, 1336–37 (9th Cir.1986) (where petitioner a Miskito Indian, relying on newspaper articles documenting persecution of Miskitos in Nicaragua); *Sotelo–Aquije v. Slattery*, 17 F.3d 33, 36 (2d Cir.1994) (where petitioner a member of municipal governing body, noting that "about thirty [such] members had been killed").

In the non-pattern or practice cases, there is a significant correlation between the asylum petitioner's showing of group persecution and the rest of the evidentiary showing necessary to establish a particularized threat of persecution. Specifically, the more egregious the showing of group persecution—the greater the risk to all members of the group—the less evidence of individualized persecution must be adduced. This correla-

---

8. The regulation provides specifically that:

> [i]n evaluating whether the applicant has sustained his burden of proving that he has a well-founded fear of persecution, the Asylum Officer or Immigration Judge shall not require the applicant to provide evidence that he would be singled out individually for persecution if:
> (A) He establishes that there is a pattern or practice in his country of nationality or last habitual residence of persecution of groups of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and
> (B) He establishes his own inclusion in and identification with such group of persons such that his fear of persecution upon return is reasonable.
> 8 C.F.R. § 208.13(b)(2)(i).

9. While it is not inconceivable that a person would be individually persecuted on the basis of his uniquely abhorrent (in the persecutor's view) political beliefs, such occurrences would be rare. Political parties, factions, ideologies, and movements are group phenomena. Moreover, it is generally the existence of a group of opponents that concerns a government or other persecutor sufficiently to provoke oppression.

tion can be complicated by the fact that, within broad groups subject to some degree of hostile treatment, subgroups may exist whose members face an even greater or more particularized threat of persecution. These persons, when seeking asylum, have a correspondingly lesser burden of showing individualized targeting.[10] In some cases, of course, where persecution of the subgroup is systematic, the subgroup member may meet his burden of showing a well-founded fear of persecution simply by showing membership in the subgroup. The main point, at any rate, is that the categories of group targeting and individual targeting are not absolute and distinct. In most cases, they co-exist.

Given the complex relationship between group targeting and individual targeting, it is not surprising that the BIA's reliance on phrases such as "singling out" occasionally results in error. While such phrases may be useful to denote the existence of a particularized threat of persecution in some circumstances, they are ill-suited to many others. In the present case, Mihaly's claims were dismissed because he was not alone—not "singled out"—as the subject of government abuse. He was, however, personally targeted for government abuse, as were his fellow detainees. In fact, the existence of a group of persons similarly situated to Mihaly in some ways strengthens his claim by establishing that his case was part of a larger government tendency to detain and harass, rather than an isolated event.[11] Although Mihaly was not a lone activist, he was part of the subgroup of anti-communists who were *active* opponents of the Communist regime— and who were, as a result, subject to a greater danger of persecution than were other anti-communists.

## D.

The BIA rejected both Agnes and Mihaly Kotasz' separate asylum claims because it found that neither of the two had made the required showing of particularization. Agnes, who claimed eligibility for asylum because of her ethnic status as a gypsy, submitted material documenting general discrimination against Hungary's gypsy minority, and stated in her testimony that she was ashamed to admit she was a gypsy. She did not demonstrate that the government systematically persecuted gypsies,[12] nor did she specify any personal experiences pertaining to individual targeting for persecution. Given her meager showing, it is clear that substantial evidence supports the BIA's determination that she is not eligible for asylum. We therefore affirm the BIA's denial of Agnes Kotasz' separate asylum petition.

With regard to Mihaly's asylum claim, in contrast, the BIA imposed a far too stringent standard. Instead of properly examining Mihaly's claim for a showing of particularization, the BIA applied its "singled out" formulation with exaggerated literalness—disregarding Mihaly's arrests because "numerous other" demonstrators were arrested along with him. Even though, as Mihaly explained at his asylum hearing, ten to twenty demonstrators were arrested at each political demonstration he participated in, that fact in no way diminishes the personal threat to Mihaly represented by his arrests. As described above, it is irrelevant whether one person, twenty persons, or a thousand persons were targeted or placed at risk. As active opponents of the Communist regime, these demonstrators were part of subgroup of anti-communists facing an even

---

**10.** For example, where a Christian sect is targeted, priests may be more at risk than ordinary church members; where a union is targeted, union leaders may be more at risk than ordinary union members (*see Zavala–Bonilla,* 730 F.2d at 565), etc.

**11.** Perhaps it is the BIA's preferred phraseology that gives rise to its reluctance to recognize that ten to twenty people may, at the same time, be "singled out" for persecution within the meaning of the asylum statute. If so, we suggest the BIA adopt a more felicitous formulation for expressing the idea of particularization: that such peo-

ple have been "targeted" or "placed at risk," for example.

**12.** In fact, the State Department report that the Kotaszes submitted in support of their claims described strong popular prejudice against gypsies, but stated that the Hungarian government had instituted a variety of programs specifically designed to improve the gypsies' economic situation. *See* U.S. Department of State, Country Reports on Human Rights Practices for 1987, at 942 (1987).

greater threat of persecution than group members in general. Accordingly, the BIA erred in rejecting Mihaly's claim on the basis that he did not show that he was "singled out" for persecution.

On four separate occasions, lasting a couple of days each, Mihaly was detained, beaten, and harassed by the police. Because of his political participation, he became known to government authorities and accrued an arrest record. While it is not our function at this point to determine whether Mihaly has established his eligibility for asylum, we find that, given the BIA's legal error, the facts of his case warrant a remand for further proceedings. The BIA should now exercise its judgment in evaluating Mihaly's asylum claim under the appropriate standards.

### III.

We therefore grant in part and deny in part the petition for review,[13] and remand to the BIA for further proceedings consistent with this opinion. Besides analyzing Mihaly Kotasz' claim of a well-founded fear of persecution under the correct standard of particularization, the BIA should consider whether he merits asylum on the basis of past persecution. *See Desir*, 840 F.2d at 729; *Matter of Chen*, Int.Dec. 3104 (BIA 1989).

### VACATED and REMANDED.

---

**13.** We reject the Kotaszes' challenge, based on our decision in *Castillo–Villagra*, to the BIA's use of administrative notice to consider political developments in Hungary. In *Castillo–Villagra*, the relevant political changes occurred *after* the alien's deportation hearing, when the case was on appeal to the BIA. *Castillo–Villagra*, 972 F.2d at 1021. Here, in contrast, the Kotaszes had notice of the political changes in Hungary *prior* to their hearing and they were given ample opportunity to discuss the effect of those changes on their asylum claim. Thus, they have no grounds for claiming unfair surprise. *See Acewicz*, 984 F.2d at 1060–61 (*Castillo–Villagra* not controlling because aliens allowed to testify regarding the effect of the change of government in Poland); *see also Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir.1992) (denial of asylum to Hungarian aliens based on administrative notice of changes in Hungary).

Nor can we say, however, that the Hungarian political developments noted by the BIA have wholly mooted the Kotaszes' claim for relief. The BIA did not rely on the changes in Hungary as an independent basis for dismissing the Kotaszes' appeal. *See Sarria–Sibaja v. INS*, 990 F.2d 442, 444 (9th Cir.1993) (when BIA introduces reasons with word "Moreover," court does not presume that those reasons constitute an independent basis for dismissal of asylum claim); *Kahssai v. INS*, 16 F.3d 323, 325 (1994). Thus, we cannot presume that those developments, *in* themselves, constitute substantial evidence to support the BIA's denial of asylum, especially since on remand the BIA will have to reevaluate the Kotaszes' claim of past persecution using the appropriate particularization requirement.