

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-2005

# Farah v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1295

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Farah v. Atty Gen USA" (2005). *2005 Decisions*. Paper 765.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/765

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>NOT PRECEDENTIAL</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-1295

———————

ABDULLAHI AWAD FARAH

Petitioner

v.

ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITED STATES\*

\* (Caption amended pursuant to Rule 43(c), Fed. R. App. Pro.)

———————

ON PETITION FOR REVIEW OF ORDER OF THE
BOARD OF IMMIGRATION APPEALS
(No. A78-701-910)

———————

Submitted Pursuant to LAR 34.1(a)
January 18, 2005

Before: ALITO, MCKEE, and SMITH, <u>Circuit Judges.</u>

(Opinion Filed: August 1, 2005)

———————

OPINION OF THE COURT

———————

<u>PER CURIAM</u>:

Abdullahi Awad Farah applied for asylum, withholding of removal, and relief

under the Convention Against Torture ("CAT").  The Board of Immigration Appeals

("BIA") denied his petition and ordered his removal from the United States, affirming the

determination of the Immigration Judge ("IJ") that Farah did not hold a well-founded fear

of persecution if returned to Somalia.  Farah appealed the BIA's final order, arguing that

the BIA's determination regarding his fear of persecution is not supported by substantial

evidence, that he is entitled to relief under the CAT, and that he cannot be removed to

Somalia because the country has no central government.  We affirm the BIA's

determination that Farah is not entitled to relief under the CAT, and also hold, in light of

the Supreme Court's decision in Jama v. Immigration & Customs Enforcement, 125 S.Ct.

694 (2005), that the Attorney General can remove Farah to Somalia without securing the

consent of that country's government.  We remand to the BIA, however, to allow the

Board to consider whether members of vulnerable social groups such as the Midgan are

"persecuted" within the meaning of the Immigration and Nationalization Act, 8 U.S.C. §§

1101(42), 1158(b), absent a showing that their attackers are motivated by an articulable

animus towards the targeted group.

## I.

In order to establish eligibility for relief under the CAT, Farah must show that he is

more likely than not to be tortured if returned to Somalia.  8 C.F.R. § 208.16(c)(2).

Torture is defined as any acts done "by or at the instigation of or with the consent or

acquiescence of a public official or other person acting in an official capacity," by means

2

of which "severe pain and suffering, whether physical or mental, is intentionally inflicted" for purposes such as obtaining confessions, punishment, or coercion "or for any reason based on discrimination of any kind." 8 C.F.R. § 208.18(a)(1); see also Sevoian v. Ashcroft, 290 F.3d 166, 175 (3d Cir. 2002). Farah presented evidence that, during periods of great civil unrest in Somalia, his stepmother, uncle, and cousin were killed. He also presented evidence that he was taken captive by a militia composed of members of the Darod clan. Tragically, the record shows that civilian deaths were common during the intensely violent phase of the Somali civil war during which Farah's relatives were killed, and therefore this evidence does not support Farah's claim to relief under the CAT without evidence of the killers' motives or identities. The record further shows that, while members of the Midgan clan are unfairly treated and vulnerable to the predations of majority clans, the manner of injuries inflicted, including detention and impressment, do not rise to the level of torture. Zubeda v. Ashcroft, 333 F.3d 463, 471 (3d Cir. 2003).

## II.

Farah argues that because Somalia has no central government the BIA erred when it ordered his removal to that country. This argument is based on an interpretation of 8 U.S.C. § 1231(b)(2) that was explicitly rejected by the Supreme Court in Jama, 125 S.Ct. 694. Given that the legal and factual circumstances in Jama are indistinguishable from those presented in this case, Farah's position is meritless and must be rejected.

3

The only remaining issue is whether the IJ's determination, affirmed by the BIA, that Farah lacked a well-founded fear of persecution if returned to Somalia was supported by substantial evidence. Farah argued before the BIA, and argues on appeal, that he fears persecution based on his membership in the Midgan clan. In support of this argument, he relies on the U.S. State Department Profile of Asylum Claims and Country Conditions for Somalia (2000 ed.). According to the report, the Midgan constitutes a low-caste group in Somali society. Farah belongs to the Madiban, a sub-group of the Midgan clan. Discussing the hardships facing minority clans and castes, the Report states that "[w]hile the minority clans were not, as a rule, singled out as military targets by the post-Barre militias, they were victimized repeatedly by armed gunmen of all affiliations." A-317. The report adopts the view that "there is no automatic correlation between clan affiliation and danger of persecution. Whether fears based on clan or sub-clan membership are well founded would depend on the nature and durability of the alleged threat and particularly on the applicant's physical location in the country." A-289. The Midgan do not control any territory and, "[b]ecause they have no natural clan allies in the wider society, and no collective voice in political circles, they can be attacked with impunity." A-297.

Membership in a Somali clan can constitute membership in a "particular social group" for the purposes of asylum. Matter of H-, 21 I&N Dec. 337, 345 (BIA 1996). In order to qualify for asylum, Farah must establish his membership in the Midgan and show

4

that persecution is based on that membership.  Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993).  Showing that persecution is based on membership requires consideration of "the motives of the agent of persecution and requires a nexus between the infliction of harm which constitutes persecution and one of the five protected grounds."  Matter of Kasinga, 1996 BIA LEXIS 15 (BIA 1996) (citing Fatin,12 F.3d at 1240).  In cases where the petitioner comes from a strife-torn country, the petitioner's burden is not satisfied by proving "that there exists a generalized or random possibility of persecution in his native country; he must show that he is at particular risk - that his predicament is appreciably different from the dangers faced by [his] fellow citizens."  Kotasz v. INS, 31 F.3d 847, 852 (9th Cir. 1994) (internal quotations omitted).  The expected violence must be "substantially more grievous in kind or degree than the general manifestation of hostility between the competing ethnic and religious groups."  Singh v. INS, 134 F.3d 962, 967 (9th Cir. 1998).  In other words, everything turns on the persecutor's motives.  Chang v. INS, 119 F.3d 1055, 1063 (3d Cir. 1997).  As the Supreme Court explained in Elias-Zacarias, the Immigration and Nationalization Act "makes motive critical," and therefore, although an applicant is not required to provide direct proof of a persecutor's motives, "he must provide some evidence of it, direct or circumstantial."  INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992).  A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds. Lukwago v. Ashcroft, 329 F.3d 157, 170 (3d Cir. 2003).

5

The BIA concluded that the deaths of Farah's relatives during the civil war and the detention that Farah suffered at the hands of the Darod militia were insufficient to give rise to a well-founded fear of persecution. We agree that this evidence, on its own, does not satisfy Farah's burden of proof. As stated above, the deaths of his relatives took place during the civil war, and there is no evidence that they were specifically targeted based on their membership in the Midgan clan or because of some connection with the Barre regime. Furthermore, as the IJ found, there is no evidence that Farah's own civil service position as an agricultural engineer stationed in a rural community marks him as a visible supporter of the Barre regime and thus exposes him to greater danger. Finally, Farah's detention by the Darod does not appear to have been motivated by the fact that he was a member of the Midgan clan; indeed, he testified that his captors mistook his clan identity and released him upon learning he was a Midgan clansmen, albeit with a threat of future impressment.

Farah's detention is symptomatic of the general plight suffered by all the Midgan-- a pervasive vulnerability resulting from membership in a socially isolated group that does not control any territory and is incapable of protecting its constituents. While the BIA relied on the State Department report's statement that "there is no automatic correlation between clan affiliation and a danger of persecution," simply stating that there is no automatic correlation begs the question whether there is, in fact, some correlation between Midgan affiliation and fear of attack. The record clearly suggests that beyond

6

the "generalized or random possibility of persecution" discussed in <u>Kotasz v. INS</u>, 31 F.3d at 852, the Midgan face a significantly higher risk of predation than other social groups because they present so-called "targets of opportunity." That said, while there is some evidence in the record that the Midgan are regarded as inferior and are viewed with some contempt by members of other clans, it is unclear whether the dangers to which the Midgan are exposed are due to their vulnerability or because of a particular animus towards the group. Because the BIA did not address the threat posed to the Midgan by marauding clan militias, and because this case raises an important question regarding the meaning of persecution as used in the Immigration and Naturalization Act, we will remand Farah's petition to the BIA for further consideration of whether membership in the Midgan clan is sufficient to give rise to a well-founded fear of persecution.