WILSON, Circuit Judge,
dissenting:
The majority in effect punishes Mohammed for testimony the Immigration Judge (IJ) deemed incredible. I cannot subscribe to the majority’s reasoning. Even without relying on Mohammed’s testimony, there is sufficient objective evidence of Eritrea’s human rights record and serious abuses to support Mohammed’s claim that he will be persecuted if he is returned to Eritrea. At the very least, I would vacate the BIA’s decision and remand to the agency for consider *1349 ation of the other compelling objective evidence presented by Mohammed in support of his petition.
I. BACKGROUND
Mohammed entered the United States on April 15, 2005, as a stowaway. Upon his arrival, Mohammed requested asylum and withholding of removal. In his credible fear interview, he stated that he was forcibly recruited into the Eritrean military in 1999. While serving, Mohammed claims that the military suspected him as a potential deserter, tied him to a tree, and beat him. He stated that he escaped from the military in 2001 and that he fears harm should he return to Eritrea because of his desertion and refusal to serve in the army.
In July 2005, Mohammed filed an application for asylum and withholding of removal under the Immigration and Nationality Act (INA) and Convention Against Torture Act (CAT) based on political opinion persecution and a threat of torture. Mohammed states that he was forcibly recruited into the Eritrean military in seventh grade. He describes incidents of physical abuse at the hands of the military, including (1) being hung from a tree with his arms tied behind his back and beaten; (2) having his arms and feet tied together behind his back for an hour each day for several days; and (3) being beaten on his leg with a stick.
Mohammed also attached to his application various articles and reports on Eritrea. An Amnesty International press release confirms that all citizens between the ages of 18 to 40 are conscripted into the Eritrean military for an indefinite period of time. Several reports state that military conscripts, evaders, and deserters were arbitrarily detained, tied up in various positions, and routinely tortured. Another report indicates that applying for asylum abroad is seen as an act of disloyalty to the Eritrean government, for which an applicant, if relief is denied, may be detained and tortured.
Three months after filing his asylum application, Mohammed filed a supplemental affidavit repeating several of the events in the asylum application and adding the following. Mohammed states that he was forced by the military to detain an old woman because her son was a military deserter. When he saw the old woman, he claims he could not bring himself to arrest her. As a result, Mohammad says he was detained by officers for two weeks, during which time he was tied up and beaten. Mohammed also states that after he escaped from the military in 2001, he went into hiding in the port town of Massawa, where he stayed until hiding aboard a ship bound for America in 2005. He asserts that, because he left Eritrea, his father was arrested, detained for three weeks, and badly beaten. Mohammed expresses his fears: “If I go back to Eritrea, I have no doubt I will be killed.”
Mohammed submitted several documents to support his application: (1) two letters to Mohammed, allegedly from his brother and his father; (2) a photograph of Mohammed and two other soldiers in military uniform; and (3) copies of several identification cards with conflicting birth dates. The first letter, purporting to be from Mohammed’s brother, describes someone coming to the house asking about Mohammed. The letter was translated into English, and midway through, the writer’s perspective changes from that of Mohammed’s brother to that of his father. The letter reads, in part:
They came for [you] a second time, grabbed me, and asked me, “Where is your son?” .... They told me that I should either bring my son or go to jail. I replied, saying, “Where do you want me to bring him from, I don’t know where he is, so I cannot tell you where *1350 he is. Do what you have to do.” They took him and jailed him for three days ... and he came back to us with his head swollen.
The second letter, from Mohammed’s father, states, in part, that Mohammed’s father was accused of “making you, my son, flee the country” and was jailed for three weeks and forced to pay a fine.
Mohammed also submitted numerous articles on the conditions in Eritrea, a 2005 Country Report on Eritrea from the Bureau of Democracy, Human Rights, and Labor, and an affidavit from an expert on the conditions in Eritrea. The affiant states that government officials in Eritrea carefully monitor draft-aged youths and, based on Mohammed’s account of his experiences, Mohammed would be singled out due to his desertion from the army and would be almost certainly subject to “official detention and physical violence.” He goes on to state that Mohammed’s “personal history and his flight to the U.S. will be well-known to the authorities there [and if] he arrived in Eritrea, government agents accessing his records would immediately impute him as an Eritrean dissident and detain him.”
The Country Report confirms that Eritrean draft-evaders have been tortured, beaten, and killed. The Report states that deserters and draft-evaders have been subjected to punishments such as prolonged sun exposure, binding of the hands, elbows, and feet for extended periods of time, and suspension from trees -with their arms tied behind their backs. The Report also confirms that the parents of military evaders have been arrested and detained. A chapter on Eritrea states that all Eritreans between the ages of 18 and 45 are required by law to serve 18 months of national service, and since 1998, have been kept in service on a continuous basis. Furthermore, the government engages in frequent, often brutal, house-to-house roundups to capture military evaders.
Lastly, Mohammed submitted a medical report from the Atlanta Department of Corrections stating that he had sustained rotator cuff injuries in both shoulders and has numerous scars, including an “8-10cm area of heterogeneous scar tissue and bony abnormality” on his left leg. The report notes in its history section that an “[e]pi-sode of torture included long term injury to shoulders, bone infection and continued pain in left leg.”
At Mohammed’s asylum hearing, he recounted much of the above history, adding the following testimony. He testified that in late 2001 he escaped from the military compound while officers were sleeping. From 2002 to 2005, Mohammed went to school and worked as a crane operator for a private company at the port in Massawa. He testified that during this time the military would come and roundup groups of people to be forced into military service. He stated that he was able to successfully hide from the military during this time, sometimes receiving advanced warnings of the roundups. He hid from the authorities in the crane in which he worked or in ships or containers at the port.
The IJ issued a written decision, finding that Mohammed’s testimony was not credible, due to inconsistent statements and inherent implausibilities. Agreeing with the IJ’s adverse credibility determination, the BIA affirmed the IJ’s denial of all relief “[ijnasmuch as the Immigration Judge considered all of the evidence of record in this case.”
II. Discussion

A. Mohammed’s Testimony

As the majority noted, Mohammed has not met his burden of showing that the IJ’s adverse credibility determination of *1351 his testimony was not based on substantial evidence. The BIA found inconsistencies in the record and implausibilities. Mohammed has not provided sufficient explanations for these inconsistencies and implausibilities. Thus, I agree with the majority that the IJ and BIA did not err in making an adverse credibility determination and in disregarding Mohammed’s testimony. See Chen v. U.S. Att’y Gen., 463 F.3d 1228, 1233 (11th Cir.2006) (per curiam).

B. Objective Evidence

Nevertheless, even disregarding his testimony, Mohammed presents compelling evidence that he is entitled to asylum based on the remaining evidence in the record. To be eligible for asylum, Mohammed must establish that he is a “refugee” within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A). One way Mohammed can establish refugee status is by demonstrating a well-founded fear of future persecution on account of his “race, religion, nationality, membership in a particular social group, or political opinion.” 8 C.F.R. § 208.13(b)(2); De Santamaría v. U.S. Att’y Gen., 525 F.3d 999, 1006-07 (11th Cir.2008). A well-founded fear of future persecution can be established by (1) past persecution on account of one of the protected grounds, which creates a presumption of a well-founded fear of future persecution; (2) a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country; or (3) a pattern or practice in the subject country of persecuting members of a statutorily defined group of which the alien is a part. See 8 C.F.R. § 208.13(b)(1), (2). In order to be well-founded, an applicant’s fear of persecution must be “subjectively genuine and objectively reasonable.” De Santamaría, 525 F.3d at 1007.
While courts have not deemed it persecution for a country to require military service of its citizens, several courts have recognized that forced military recruitment may constitute persecution if the petitioner is refusing to join “a military whose acts are condemned by the international community as contrary to the basic rules of human conduct.” Mekhoukh v. Ashcroft, 358 F.3d 118, 126 (1st Cir.2004). See also Kibinda v. Att’y Gen., 477 F.3d 113, 121 (3d Cir.2007); Islami v. Gonzales, 412 F.3d 391, 396 (2d Cir.2005); Pelinkovic v. Ashcroft, 366 F.3d 532, 538 (7th Cir.2004); M.A. v. INS, 899 F.2d 304, 312 (4th Cir.1990) (en banc); Matter of A-G-, 19 I. & N. Dec. 502, 506 (BIA 1987).
There are two exceptions to the general rule that compulsory military service does not provide asylum seekers with adequate cause to claim persecution. “First, an alien may be eligible for asylum if refusal to serve in the military results ... in disproportionately severe punishment” and “[sjecond, an alien is eligible for asylum if the alien would be associated with a military whose acts are condemned by the international community .... ” Mek-houkh, 358 F.3d at 126.
Mohammed demonstrated the elements of both claims. He presented substantial evidence that there is a reasonable possibility that he would have to serve in a military that commits human rights violations. Moreover, if he does not serve, he presented substantial evidence that he will receive disproportionately severe punishment. This substantial evidence compels a contrary finding to the IJ’s. I will discuss each claim in turn.

1. Mohammed Would Be Forced to Join a Military Who Acts Are Condemned by the International Community

To support a claim that he would be forced to join a “military whose acts are condemned by the international communi *1352 ty as contrary to the basic rules of human conduct,” Mohammed must show that (1) the Eritrean military has been condemned by the international community; (2) there is a reasonable possibility that Mohammed will be forced to serve in the Eritrean military upon return; and (3) he has a “genuine conscientious objection to service.” Mekhoukh, 358 F.3d at 128.

a. The Eritrean Military Has Been Condemned by the International Community

To support a claim that Mohammed would be forced to join a “military whose acts are condemned by the international community as contrary to the basic rules of human conduct,” he must first show that the Eritrean military has been condemned by the international community. Id. at 128. The IJ correctly concluded that the Eritrean military has been condemned by the international community for committing human rights abuses. The IJ relied on a United States State Department Report noting the Eritrean military’s numerous human rights abuses. The Report confirmed that the Eritrean military engages “in torture and physical beatings of prisoners, particularly during interrogations” and that “during the year, security forces severely mistreated and beat army deserters, draft evaders, and members of particular social groups.” Therefore, Mohammed successfully showed that the Eritrean military has been condemned by the international community. See Mekhoukh, 358 F.3d at 128.

b. There Is a Reasonable Possibility that Mohammed Will Be Forced to Seme in the Eritrean Military Upon Return

To support a claim that Mohammed would be forced to join a “military whose acts are condemned by the international community as contrary to the basic rules of human conduct,” he must next show that there is a reasonable possibility that he will be forced to serve in the Eritrean military upon return to Eritrea. Mek-houkh, 358 F.3d at 128. The IJ denied Mohammed relief based on its conclusion that Mohammed failed to show he would be forced to rejoin the military if he was returned to Eritrea. Without his testimony, the IJ reasoned, nothing established how Mohammed left the military — without Mohammed’s testimony, the evidence does not show whether Mohammed deserted the military or whether he was voluntarily discharged. Thus, the IJ held that Mohammed failed to establish a reasonable possibility that he would be forced to serve in the military if he returns to Eritrea. The critical issue, therefore, is whether substantial evidence supports the IJ’s finding regarding the possibility of forced military service.
The IJ found that because Mohammed’s testimony was incredible, his claim effectually failed. While it is true that “an adverse credibility determination alone may be sufficient to support the denial of an asylum application,” an adverse credibility determination is not dispositive in some cases. Forgue v. Att’y Gen., 401 F.3d 1282, 1287 (11th Cir.2005) (internal citations omitted) (emphasis added). “If the applicant produces no evidence other than his testimony, an adverse credibility determination is alone sufficient to support the denial of an asylum application.” Id. This is not the case here. Indeed, Mohammed produced other significant evidence in addition to his testimony.
As we noted in Forgue, “[o]f course[ ] an adverse credibility determination does not alleviate the IJ’s duty to consider other evidence produced by an asylum applicant.” Id. The IJ “must still consider all evidence introduced by the applicant.” Id. If “the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it *1353 is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances.” Id.
Here, the IJ’s adverse credibility determination did not alleviate his duty to consider the other objective reports and evidence produced by Mohammed. Even though the IJ recognized that the Eritrean military has been condemned by the international community for committing human rights abuses, the IJ made his determination solely on Mohammed’s testimony, effectually punishing Mohammed for stories that the IJ deemed implausible and that, in the IJ’s mind, did not add up.
The IJ denied Mohammed asylum relief, finding that the “record fails to establish that there is a reasonable possibility that [Mohammed] will have to serve in the military if he returns to Eritrea.” While the IJ found that the record established Mohammed’s prior service in the army, he found that Mohammed had not demonstrated “how he left the army” or that he was a deserter. The IJ theorized that Mohammed may have been “simply released from his military service.” If this were the case, he concluded, Mohammed would not likely face continued military service upon his return to Eritrea.
Considering the record as a whole, I conclude that the IJ’s supposition that Mohammed may have simply been released from military service and, if so, would not likely face military service upon return, is not supported by “reasonable, substantial, and probative evidence.” D-Muhumed v. U.S. Att’y Gen., 388 F.3d 814, 818 (11th Cir.2004) (quotations omitted). The objective articles and reports Mohammed submitted maintain that the Eritrean military does not simply “release” conscripts from service, as the IJ supposed. On the contrary, the record establishes that those conscripted into the Eritrean military are kept in service indefinitely. While by law “[a]ll Eritreans between the ages of 18 and 45 are required ... to perform 18 months of national service,” in practice “conscripts have been kept in service on a continuous basis” since 1998. Military conscripts are generally not released from service but instead are kept in service indefinitely. The IJ’s theories about military service in Eritrea “are little more than idle musings.” Don v. Gonzales, 476 F.3d 738, 754 (9th Cir.2007) (Wardlaw, J., dissenting). His personal speculation about how the Eritrean military operates is no substitute for substantial evidence. Lopez-Reyes v. INS, 79 F.3d 908, 912 (9th Cir.1996). The substantial evidence points to a conclusion contrary to the IJ’s.
Further, even if Mohammed were released, the IJ’s theory that Mohammed would not likely face continued military service does not hold water. “Those who complete[ ] national service ... are subject to recall and reserve duties.” Moreover, “[r]e-induction for those who have already served has been used as political punishment for ... [those] who have expressed public criticism of government policy.” “There is no exception for conscientious objectors.” So even if Mohammed were “simply released from his military service” as the IJ contemplated, he could be recalled. Again, the IJ’s theory demonstrates that he relied on guesswork about how a military operates and not on the substantial objective evidence before him.
The majority engages in much of the same speculation as the IJ does regarding forced military service and employs questionable logic. It finds that “substantial evidence supports the finding of the [IJ] that Mohammed failed to prove that he would be forced to join the military if he returned to Eritrea [because] Mohammed’s evidence that the military has searched for him at the home of his family since his arrival in the United States is unreliable, and Mohammed’s testimony about his experiences during the three *1354 years before he left Eritrea does not compel a finding that he will be conscripted if he returns.” I disagree with the majority’s approach.
First, the majority bolsters its contention that the record supports the IJ’s finding that Mohammed would not likely face continued military service based on Mohammed’s testimony that “[bjefore he left Eritrea, Mohammed, without incident, obtained a government-issued identification card, worked in a government-owned facility in his hometown, reenrolled in the school from which he had been conscripted, and regularly visited his family at their home.” In doing this, the majority relies on the very testimony that the IJ deemed incredible. The IJ called it “inherently implausible” and felt “compelled] ... to find that [Mohammed] did not testify credibly.” Yet Mohammed’s incredible testimony about his experiences during the three years before he left Eritrea are the basis of the majority’s conclusion about forced military service.
Second, the majority cherry-picks evidence, disregarding Mohammed’s testimony as incredible and yet simultaneously basing its conclusion on the very evidence it was quick to throw out. The IJ never made a finding that those particular parts of Mohammed’s testimony were credible. If the majority would like to open up this box, I am happy to do so. But here, the majority is just having its cake and eating it too — refusing to believe Mohammed when doing so would support Mohammed’s asylum application and selectively relying on Mohammed’s testimony when it suits the majority, effectively punishing Mohammed for testimony the IJ deemed implausible. While the law does permit a trier of fact to credit some parts of Mohammed’s testimony and discredit others, as the majority points out, I find this approach to be fundamentally unfair. Mohammed is penalized by his testimony either way — either it is incredible and thus cannot support his asylum application, or it is selectively used to support removing him. I cannot support such a methodology to well-founded fear determinations.
Should we look at Mohammed’s testimony in its totality, examining the entire contents of the box that the majority has opened, it by no means supports the IJ’s “finding that Mohammed lived an open and peaceful life after his service in the military.” Mohammed did not testify that he “lived an open and peaceful life.” On the contrary, he testified that he spent three years in hiding in order to avoid military conscription. That Mohammed was able to avoid military conscription for three years does not support a contention that his life was “open and peaceful.” The majority’s ruminations on peaceful living in Eritrea are not compelling. Cf. Don v. Gonzales, 476 F.3d 738, 754-55 (9th Cir. 2007) (Wardlaw, J., dissenting) (finding the majority’s and IJ’s conjectures “little more than idle musings ... [and] speculation and not a substitute for substantial evidence”). If the majority would like to give credence to Mohammed’s testimony about living and working in Eritrea for three years, fairness requires a recognition of Mohammed’s testimony that he was only able to do this because of his luck in hiding from the military. He would hide in the crane in which he worked or in ships or containers at the port. To say that Mohammed can return to an open life of peace begs the underlying issue that Mohammed was avoiding military conscription the entire time, which objective evidence makes clear will be a constant issue until Mohammed reaches the age of 40, at which time he would no longer be of military age. Mohammed has about 18 years of hiding to go. Sending an alien back so he may go into hiding from a military that commits human rights abuses seems a backward solution when the majority claims he is returning to “an open and peaceful life.”
*1355 Third, not only do I find the majority’s approach to be fundamentally unfair, but I find its approach to be illogical. The majority relies on testimony the IJ deemed incredible only when its incredibility flies in the face of objective evidence in the record, and it relies on testimony deemed credible only when its credibility is at odds with objective evidence. The majority relies on the incredibility determination of Mohammed’s testimony about hiding from military conscription, even though the objective evidence in the record consistently states that Eritreans of military age are kept in service indefinitely or are subject to recall on a continuous basis. Based on the objective evidence in the record, hiding seems one of the only ways to succeed at avoiding military conscription. Moreover, Mohammed’s testimony that leads the majority to contend that he led “an open and peaceful life” is deemed credible, even though the objective evidence supports the opposite of an open and peaceful life. While the majority is correct that a “trier [of fact] may believe one part of an applicant’s story and not believe others,” this approach defies logic. It is backwards— the approach to determining credibility defies the objective evidence both ways.
The majority’s musings on Eritrean life and the military are no more a substitute for substantial evidence than were the IJ’s musings. Because objective evidence demonstrates that conscripts are generally kept in service continually and may be subject to recall at any time, the record compels a finding that Mohammed will have to serve in the military if he returns to Eritrea.

c. Mohammed Has a Genuine Conscientious Objection to Service

To support a claim that Mohammed would be forced to join a “military whose acts are condemned by the international community as contrary to the basic rules of human conduct,” he must lastly show that he has a “genuine conscientious objection to service.” Mekhoukh, 358 F.3d at 128. Mohammed has a “genuine conscientious objection to service.” This element requires little discussion. The IJ himself never disputed this. He instead explicitly recognized that “opposition to military conscription” is an “aspect of [Mohammed’s] asylum application [that] appear[s] to be plausible in light of common logic and evidence.”

2. Refusal to Serve in the Eritrean Military Results in Disproportionately Severe Punishment

Substantial objective evidence in the record supports that “[r]efusal to serve in the [Eritrean] military results not in normal draft evasion penalties, but rather in disproportionately severe punishment.” Mekhoukh, 358 F.3d at 126. First, torture is used as “standard military punishment.” The methods of torture are heinous. One of the various methods used is “the helicopter”:
[The victim is] tied with a rope by hands and feet behind the back, lying on the ground face down, outside in the hot sun, rain or freezing cold nights, stripped of upper garments. This is a punishment allocated for a particular number of days, the maximum reported being 55 days ... but is more often one or two weeks. The prisoner is tied in this position 24 hours a day, except for two or three short breaks for meals and toilet functions.
Another is the “Jesus Christ”:
[The victim is] stripped to the waist, wrists tied, and standing on a block with hands tied to a tree branch; the block is removed, leaving the victim suspended with the feet just off the ground in a *1356 crucifix-like posture. Beatings are inflicted on the bare back. This is said to be an extremely severe torture, restricted to only 10 to 15 minutes to avoid serious lasting injury.
Another is known as the “number eight”:
[Ijnside a special torture room, the victim is tied by wrists behind the back and with the feet bound; a stick is placed under the knees and supported on a framework on both sides horizontally, and the body is turned upside down with the feet exposed. The soles of the feet are beaten with sticks or whipped.
Those who attempt to evade military service, or who are even suspected of evading, may be detained and tortured. According to Amnesty International, “[t]he penalty for evading conscription or protesting against military service is three years’ imprisonment, but in practice those caught are tortured and arbitrarily detained for several months with hard labor, before being forced back into the army.” For example, in November 2004, Eritrean security forces “indiscriminately arrested thousands of people suspected of evading military conscription. People were arrested at places of work, in the street, at roadblocks and at home. Prisoners were taken to [an] ... army prison .... That night, ... [sjoldiers opened fire and shot dead at least a dozen prisoners and wounded many more.” Further, “[m]any prisoners [are] kept in overcrowded metal shipping containers in unventilated, hot and unhygienic conditions and denied adequate food and medical treatment. Conditions in military prisons around the country [are] extremely harsh.” The Country Report found that some who attempted to evade have been killed. The great “likelihood that [Mohammed] will be punished” for refusal to serve is beyond dispute. See Mojsilovic, 156 F.3d at 747 (quotation and citation omitted).
Accordingly, I conclude that Mohammed has established a well-founded fear of persecution based on forced service in a military condemned by the international community and that refusal to serve in the military results in disproportionately severe punishment. See Mekhoukh, 358 F.3d at 126. Mohammed is therefore entitled to asylum.
The majority finds that the evidence of human rights violations in Eritrea does not compel a finding that Mohammed has a well-founded fear of future persecution because he must present evidence “that he will be singled out for persecution.” This reasoning neglects to appreciate “the complex relationship between group targeting and individual targeting.” Kotasz v. INS, 31 F.3d 847, 854 (9th Cir.1994). The Ninth Circuit has cautioned against use of the phrase “singled out” for this very reason — “it is not surprising that the BIA’s reliance on phrases such as ‘singling out’ occasionally results in error. While such phrases may be useful to denote the existence of a particularized threat of persecution is some circumstances, they are ill-suited to many others.” Id.
The majority claims that “the law provides that Mohammed bore the burden of proving his fear of future persecution.” I disagree. First, there are “situations in which members of an entire group ... are systematically persecuted. In such cases, group membership itself subjects the alien to a reasonable possibility of persecution,” so that he can satisfy the well-founded fear standard “simply by proving membership in the targeted group.” Id. at 852 (emphasis in original). When there is such “a pattern or practice” in the subject country of persecuting members of a statutorily defined group of which the alien is a part, 8 C.F.R. § 208.13(b)(2), the INS recognizes “group persecution as sufficient in itself to establish eligibility for asylum in *1357 certain circumstances,” Kotasz, 31 F.3d at 852.
Second, in non-pattern or practice cases, while “members of the disfavored groups are not threatened by systematic persecution of the group’s entire membership, the fact of group membership nonetheless places them at some risk.” Id. at 853. In these cases “there is a significant correlation between the asylum petitioner’s showing of group persecution and the rest of the evidentiary showing necessary to establish a particularized threat of persecution.” Id. In other words, “the more egregious the showing of group persecution — the greater the risk to all members of the group — the less evidence of individualized persecution must be adduced.” Id.
The majority’s blanket statement that an alien must present evidence “that he will be singled out for persecution,” fails to engage in this weighing that the complex relationship between group and individual targeting requires. Mohammed’s showing of the government’s human rights record and serious abuses committed against draft-eligible Eritreans is egregious enough that a more particularized threat of persecution against him was not necessary.
Conclusion
We show deference to the IJ and the BIA, but we are not a mere rubber stamp for their determinations. See De Santa-maría v. U.S. Att’y Gen., 525 F.3d 999, 1013 (11th Cir.2008) (vacating the BIA’s decision when substantial evidence did not support the findings of the IJ). It seems as though the IJ decided on a result before weighing the evidence before him, failing to consider the objective reports and evidence produced by Mohammed in support of his application for asylum and withholding of removal, basing his decision solely on an adverse credibility determination. Since the IJ and the BIA neglected their duty to consider all of the evidence in support of the petition, I would remand this matter back for reconsideration. See Gonzales v. Thomas, 547 U.S. 183, 186, 126 S.Ct. 1613, 1615, 164 L.Ed.2d 358 (2006) (“A court of appeals is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.”) (citations and quotations omitted). See also Jean-Pierre v. U.S. Att’y Gen., 500 F.3d 1315, 1326 (11th Cir.2007).
I respectfully dissent.